653 F.2d 180
 Thomas DOE and Jane Doe, Minors, by Mary Roe, Their next
friend, on behalf of themselves and all others
similarly situated, Plaintiffs-Appellants,
v.
V. J. STEGALL, Etc., et al., Defendants-Appellees,
State of Mississippi, Intervenor-Appellee.
 No. 79-3755.
 United States Court of Appeals,
Fifth Circuit.
 
 Unit A
 Aug. 10, 1981.
 Charles H. Ramberg, Robert Rubin, American Civil Liberties Union of Miss., Jackson, Miss., Christopher A. Tabb, Brandon, Miss., for plaintiffs-appellants.
 Bill Allain, Atty. Gen., W. V. Westbrook, III, Hubbard T. Saunders, IV, Sp. Asst. Attys. Gen., Jackson, Miss., for State of Miss.
 James W. Smith, Jr., Fred M. Harrell, Jr., Brandon, Miss., for V. J. Stegall et al.
 Appeal from the United States District Court for the Southern District of Mississippi.
 Before GEE, TATE and WILLIAMS, Circuit Judges.
 JERRE S. WILLIAMS, Circuit Judge:
 
 
 1
 This interlocutory appeal requires us to decide whether a mother and her two children may proceed under fictitious names with their suit challenging the constitutionality of prayer and Bible reading exercises in Mississippi public schools. The district court determined that it had no jurisdiction over a suit mounted by plaintiffs who wished to shield themselves from hostile public reaction to their controversial lawsuit by maintaining their anonymity. Balancing the general principle that parties must disclose their identities to sue in federal court against the countervailing factors presented by this suit, we hold that the district court has jurisdiction of this suit and must allow the plaintiffs to proceed under fictitious names.
 
 I.
 
 2
 Mary Roe brought this suit in October 1979 on behalf of Thomas Doe and Jane Doe, her two minor children who attended the Pelahatchie Middle School in Rankin County, Mississippi. Their suit complains of religiously-oriented ceremonies broadcast each morning over the public address system at the Pelahatchie Middle School. Plaintiffs allege that the school faculty and administrators randomly select students to read poetry, Bible verses, and prayers of a Protestant cast for the school's daily morning devotional observance. The chosen students are expected to rehearse their devotionals before a classroom of their peers and then to perform over the school-wide public address system. Verbal pressure is allegedly exerted on students who do not participate willingly.
 
 
 3
 Pelahatchie Middle School Principal Stegall concedes that "inspirational programs" are conducted in the manner plaintiff suggests, but denies that their character is exclusively Protestant, or for that matter, religious. Stegall insists that student participation is strictly voluntary.[1] Further, the Superintendent of Rankin County Schools denies that the school board maintains a policy requiring school prayer.[2]
 
 
 4
 The complaint, framed as a class action,[3] sought to enjoin routine daily religious observances in the county's public schools. It also sought a declaratory judgment invalidating the recently enacted Mississippi statute authorizing voluntary prayer in Mississippi public schools.[4] The statute and the religious observances, the complaint charges, violate the establishment clause of the First Amendment.
 
 
 5
 On November 1, 1979, the plaintiffs promptly moved for a protective order to preserve their anonymity. They agreed to disclose their identities to the defendants and to the Court;[5] their motion merely sought to bar disclosure to the general public. Fearing harassment and violence directed against the Roe family generally and the Doe children in particular should their names be publicly disclosed, the plaintiffs asked that they be permitted to proceed under fictitious names.[6] A motion for preliminary injunction to stop the ongoing morning religious observances was filed simultaneously. The named defendants officials of the Rankin County schools and the State of Mississippi, which had intervened to defend the constitutionality of its statute, opposed both motions. After considering documentary evidence and legal arguments proferred by both sides, the district court determined that it had no jurisdiction over the lawsuit and issued an order denying both motions. That order is the subject of this appeal.
 
 II.
 
 6
 We turn first to the appealability of the order before us. Our Court has no authority to review "tentative, informal, or incomplete" decisions made by district courts in the course of reaching an ultimate disposition of the controversy before them. Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 546, 69 S.Ct. 1221, 1225, 93 L.Ed. 1528 (1949). 28 U.S.C. § 1291 does, however, authorize our review of decisions rendered during the pendency of a lawsuit that, as a practical matter, have a final effect.
 
 
 7
 The issue before us was squarely addressed by Southern Methodist University Ass'n v. Wynne & Jaffe, 599 F.2d 707 (5th Cir. 1979). There, our Court was confronted with an interlocutory appeal from a district court's refusal to issue a protective order preserving the anonymity of Title VII plaintiffs suing two law firms for sex discrimination. Applying a tripartite test derived from the progeny of Cohen, the panel determined that orders denying plaintiffs an opportunity to proceed anonymously: (1) disposed of the disclosure issue, "leaving nothing 'open, unfinished, or inconclusive' "; (2) addressed issues " 'completely collateral to the cause of action asserted' " and were not "mere steps toward a final judgment on the merits"; and (3) affected " 'important rights which would be lost, probably irreparably' if review had to await final judgment." Southern Methodist University Ass'n, 599 F.2d at 712, quoting Abney v. United States, 431 U.S. 651, 658, 97 S.Ct. 2034, 2039, 52 L.Ed.2d 651 (1977); Coopers & Lybrand v. Livesay, 437 U.S. 463, 468, 98 S.Ct. 2454, 2457, 57 L.Ed.2d 351 (1978); United States v. Gurney, 558 F.2d 1202, 1207 (5th Cir. 1977), cert. denied, 435 U.S. 968, 98 S.Ct. 1606, 56 L.Ed.2d 59 (1978); In re Nissan Motor Corporation Antitrust Litigation, 552 F.2d 1088, 1094-95 (5th Cir. 1977). Based on this analysis, Southern Methodist University Ass'n held the challenged ruling on the requested protective order to be an appealable collateral order under 28 U.S.C. § 1291.
 
 
 8
 The posture of the order challenged by the Does meshes precisely with the orders reviewed in Southern Methodist University Ass'n. The result cannot be otherwise: the district court's denial of the Doe's motion is an appealable collateral order.
 
 III.
 
 9
 A second threshold consideration is the Article III vitality of this nearly two year old controversy. In February 1980, the Does and Rankin County school officials entered into a consent decree prohibiting further broadcasts of prayer, Bible readings, or "other material of a religious devotional nature" over public address systems of the Rankin County schools.[7] The Rankin County defendants argue that the consent decree moots the Does' appeal from the district court's order denying their motion for a preliminary injunction. Their involvement in a justiciable controversy ended, the Rankin County school officials maintain, when the decree was entered.
 
 
 10
 The State of Mississippi, on the other hand, in effect concedes that a live controversy remains over the constitutionality of Miss.Code Ann. § 37-13-4. See n.4, supra. Because the State also opposed the plaintiffs' motion for a protective order, a justiciable controversy continues to underlie this interlocutory appeal.
 
 
 11
 We believe that a continuing controversy may extend to the Rankin County defendants as well.[8] The consent decree prohibits three varieties of religious observance over the Rankin County school public address systems. Plaintiffs complaint, however, seeks an injunction barring "any further religious observance" in Rankin County schools. Activities within the scope of relief sought in the Does' complaint for example, morning devotionals in an individual classroom are not addressed by the consent decree. The remedy afforded in the consent decree is more narrowly drawn than the ban on religious practices in the Rankin County schools requested by the Does. Thus, we cannot say at this stage of the proceedings that the entire controversy between the Does and the Rankin County school officials is moot.[9]
 
 IV.
 
 12
 Having determined that we have jurisdiction to hear this appeal, we reach the merits of the Does' claim that their motion for a protective order was wrongly denied. Fed.R.Civ.P. 26(c) vests in the trial court discretion over litigants' requests for protection from "annoyance, embarrassment, oppression, or undue burden or expense" in the discovery process. Moreover, the trial court enjoys broad discretion over discovery on jurisdictional issues. Washington v. Norton Mnfg. Inc., 588 F.2d 441, 443 (5th Cir.), cert. denied, 442 U.S. 942, 99 S.Ct. 2886, 61 L.Ed.2d 313 (1979). Therefore, the ordinary standard for appellate review of trial court rulings on protective orders is whether the trial court abused its discretion. Perel v. Vanderford, 547 F.2d 278, 280 (5th Cir. 1977). Conversely, if the trial court's ruling is based upon an error in law it is freely reviewable on appeal.
 
 
 13
 In denying the Does' motion for a protective order, the district judge determined that he lacked jurisdiction to decide a case brought by plaintiffs who wished to prevent public disclosure of their identities under these circumstances. The district court's order cited Southern Methodist University Ass'n v. Wynne & Jaffe, 599 F.2d at 713, and reasoned:
 
 
 14
 This is certainly not an unusual case where the identity of the parties could possibly do more than annoy the parties and subject them to possible criticism. That is certainly not enough to deprive this Court and the public in general of the right to know the identity of the parties who are permitted to bring difficult constitutional questions before this Court without any legitimate and impelling reasons so to do.
 
 
 15
 Record at 44-45 (S.D.Miss., order filed November 12, 1979).
 
 
 16
 We find that the district court erred in denying the plaintiffs' motion on the basis of Southern Methodist University Ass'n v. Wynne & Jaffe. Our reversal of the district judge's ruling on the Does' motion is predicated upon this erroneous application of the legal principles announced in Southern Methodist University Ass'n, not upon an abuse of discretion.
 
 
 17
 The Federal Rules of Civil Procedure require plaintiffs to disclose their names in the instrument they file to commence a lawsuit. Fed.R.Civ.P. 10(a). Public access to this information is more than a customary procedural formality; First Amendment guarantees are implicated when a court decides to restrict public scrutiny of judicial proceedings. Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 100 S.Ct. 2814, 2829 & n.17, 65 L.Ed.2d 973 (1980).[10]
 
 
 18
 The equation linking the public's right to attend trials and the public's right to know the identity of the parties is not perfectly symmetrical. The public right to scrutinize governmental functioning, 100 S.Ct. at 2827, is not so completely impaired by a grant of anonymity to a party as it is by closure of the trial itself. Party anonymity does not obstruct the public's view of the issues joined or the court's performance in resolving them. The assurance of fairness preserved by public presence at a trial is not lost when one party's cause is pursued under a fictitious name. These crucial interests served by open trials, see Richmond Newspapers, 100 S.Ct. at 2826-29, are not inevitably compromised by allowing a party to proceed anonymously. Nevertheless, there remains a clear and strong First Amendment interest in ensuring that "(w)hat transpires in the courtroom is public property." Craig v. Harney, 331 U.S. 367, 374, 67 S.Ct. 1249, 1254, 91 L.Ed. 1546 (1947).
 
 
 19
 Yet, there is precedent for departing from a procedural custom fraught with constitutional overtones to accommodate a plaintiff's asserted need to proceed anonymously through the use of a fictitious name. See cases compiled in Southern Methodist University Ass'n, 599 F.2d at 712-13 nn.8, 9, 10, 11 & 12. The task before us in this case is to decide when "the normal practice of disclosing the parties' identities yields 'to a policy of protecting privacy in a very private matter.' " Id. at 713, quoting Doe v. Deschamps, 64 F.R.D. 652, 653 (D.Mont.1974).
 
 
 20
 In Southern Methodist University Ass'n, our Court undertook to isolate the characteristics common to those exceptional cases in which the need for party anonymity overwhelms the presumption of disclosure mandated by procedural custom. Judge Ainsworth, writing for the panel, identified factors presented in cases permitting party anonymity, only the first of which is present in the suit at bar:
 
 
 21
 (1) plaintiffs seeking anonymity were suing to challenge governmental activity;
 
 
 22
 (2) prosecution of the suit compelled plaintiffs to disclose information "of the utmost intimacy; " and
 
 
 23
 (3) plaintiffs were compelled to admit their intention to engage in illegal conduct, thereby risking criminal prosecution.
 
 
 24
 The parties seeking to proceed under pseudonyms in Southern Methodist University Ass'n satisfied none of these characteristics. Thus, their arguments asserted in favor of anonymity were weighed against the interest mandating full disclosure in judicial proceedings and found wanting.
 
 
 25
 The Southern Methodist University Ass'n analysis of the issue is perceptive and entirely accurate. Nevertheless, we think it would be a mistake to distill a rigid, three-step test for the propriety of party anonymity from the fact-sensitive holding in Southern Methodist University Ass'n. The opinion never purports to establish the three common factors it isolates as prerequisites to bringing an anonymous suit. Moreover, the cases examined in Judge Ainsworth's opinion belie the notion that a party must admit criminal conduct or criminal intent in order to proceed under a fictitious name. 599 F.2d at 713 n.11, citing Doe v. Carleson, 356 F.Supp. 753 (N.D.Cal.1973); Doe v. Gillman, 347 F.Supp. 482 (N.D.Iowa 1972) (challenging state welfare regulations conditioning AFDC assistance on recipients' cooperation with prosecutions of spouses for nonsupport); Doe v. Shapiro, 302 F.Supp. 761 (D.Conn.1969) appeal dismissed on other grounds, 396 U.S. 488, 90 S.Ct. 641, 24 L.Ed.2d 677 (1970) (challenging state welfare regulations conditioning assistance payments to illegitimate children on recipient-mother's disclosure of the father's identity).
 
 
 26
 We think the factors common to anonymous party suits isolated in Southern Methodist University Ass'n deserve considerable weight in the balance pitting privacy concerns against the presumption of openness of judicial proceedings. The Does clearly challenge governmental activity. But of course, in only a very few cases challenging governmental activity can anonymity be justified. Here, the Does complain of public manifestations of religious belief; religion is perhaps the quintessentially private matter. Although they do not confess either illegal acts or purposes, the Does have, by filing suit, made revelations about their personal beliefs and practices that are shown to have invited an opprobrium analogous to the infamy associated with criminal behavior. Evidence on the record indicates that the Does may expect extensive harassment and perhaps even violent reprisals if their identities are disclosed to a Rankin County community hostile to the viewpoint reflected in plaintiffs' complaint. See n.6, supra. The threat of hostile public reaction to a lawsuit, standing alone, will only with great rarity warrant public anonymity. But the threats of violence generated by this case, in conjunction with the other factors weighing in favor of maintaining the Does' anonymity, tip the balance against the customary practice of judicial openness.
 
 
 27
 A final factor we find especially persuasive is the fact that plaintiffs are children. The law of Mississippi, as in many other states as well, shields the identities of child-litigants from public disclosure in certain circumstances. See Miss.Code Ann. § 43-21-251 (Supp.1980) (providing for confidentiality of juvenile court records); Miss.Code Ann. § 93-17-25 (1972) (providing for confidentiality of adoption proceedings). The gravity of the danger posed by the threats of retaliation against the Does for filing this lawsuit must also be assessed in light of the special vulnerability of these child-plaintiffs. Again, we do not mean to imply that all civil rights suits mounted in the name of children may be prosecuted anonymously. Rather, we view the youth of these plaintiffs as a significant factor in the matrix of considerations arguing for anonymity here.
 
 
 28
 We advance no hard and fast formula for ascertaining whether a party may sue anonymously. The decision requires a balancing of considerations calling for maintenance of a party's privacy against the customary and constitutionally-embedded presumption of openness in judicial proceedings. We emphasize the special status and vulnerability of the child-litigants, the showing of possible threatened harm and serious social ostracization based upon militant religious attitudes, and the fundamental privateness of the religious beliefs, all of which are at the core of this suit to vindicate establishment clause rights. We conclude that the almost universal practice of disclosure must give way in this case to the privacy interests at stake. The Does should have been permitted to proceed under fictitious names. Therefore, the district court's determination that it lacked jurisdiction to issue a protective order cannot stand.
 
 
 29
 REVERSED.
 
 GEE, Circuit Judge, dissenting:
 
 30
 This case presents several troubling aspects. The first is the apparent fact situation itself. It is decades on, now, since the Supreme Court concluded that compulsory religious observances in public school programs were unconstitutional. Right or wrong, this is and long has been the settled law of the land. To work to change it is one thing: blatantly to ignore it, at this late date, is quite another. Nor can it be denied that the record in this case contains some indications, though not overly reliable ones, of anger and frustration on the part of some local citizens at the bringing of this suit. There is even one expression, contained in a newspaper account of a parents' meeting with the local school board that lends itself to literal interpretation as a physical threat.[1]
 
 
 31
 A second difficulty arises from the sketchy and only marginally relevant record on which we are forced to travel: some newspaper clippings and "Mary Roe's" anonymous affidavit stating that "some people" in the community feel strongly about the lawsuit, are "angry, very angry," and are "the same kind of people who were burning down churches and people's homes and shooting guns not too many years ago." Though there is other matter in the record a 1978 comment from "The Christian Century" about religious proselytizing in the schools of Glen Ellyn, Illinois; a 1962 piece from "The Nation" on reaction to a Supreme Court school-prayer decision; and what appears to be a mailgram from James T. McCollum, the subject of the Supreme Court's 1948 religious instruction case,[2] on the harassment that he suffered as a result of it thirty years gone by in Champaign County, Illinois little of this bears much relevance to this controversy. These bits and pieces of reportage and anonymous affidavits to vague fears of reprisal seem to me a slender basis indeed for permitting anonymous legal proceedings in federal court. Parties seeking such unusual and drastic relief should, I think, come prepared to make a far stronger showing than this: about all that I can deduce from the record matter offered by plaintiffs is that elsewhere and long ago harassment followed on such a proceeding as this, that this might happen again, that some of the local church people are very upset by this suit, and that they are "the same kind of people" who were acting violently "not too many years ago." Indeed, this last, a literary figure of deliberate vagueness, might refer to Reconstruction times and perhaps does. Even granting the inherent difficulty of making such proof while preserving one's anonymity, these are small potatoes and few in the hill.
 
 
 32
 Finally, I am disturbed by what seems to me dubious reasoning by the majority and a doubtful result. The majority commences its analysis in Part IV of the opinion, the only portion with which I have difficulty, by acknowledging the clear and strong First Amendment interest in public judicial proceedings and the necessarily exceptional nature of that case which may properly be prosecuted anonymously. It then pays its respects to the three factors laid down in Southern Methodist University Association v. Wynne & Jaffe, 599 F.2d 707 (5th Cir. 1979), for consideration in passing on such requests, noting that only one of these is present here. Having announced earlier in Part IV (p. 185) that the trial court was to be reversed, not for abuse of its discretion, but for erroneous application of Wynne & Jaffe principles, the majority seems to me to cast aside those principles[3] and substitute its own simple balancing test:We advance no hard and fast formula for ascertaining whether a party may sue anonymously. The decision requires a balancing of considerations calling for maintenance of a party's privacy against the customary and constitutionally-embedded presumption of openness in judicial proceedings. We emphasize the special status and vulnerability of the child-litigants, the showing of possible threatened harm and serious social ostracization based upon militant religious attitudes, and the fundamental privateness of the religious beliefs, all of which are at the core of this suit to vindicate establishment clause rights. We conclude that the almost universal practice of disclosure must give way in this case to the privacy interests at stake. The Does should have been permitted to proceed under fictitious names.
 
 
 33
 And, along the way, the majority notes that its decision is especially influenced by two factors that it notes: the presence in the case of children as plaintiffs and the necessity that the majority ascertains for plaintiffs to have "made revelations about their personal beliefs and practices that are shown to have invited an opprobrium analogous to the infamy associated with criminal behavior." P. 186. I suggest, with deference, that neither of these elements is really or, at any rate, necessarily present here.
 
 
 34
 Taking the last first, no disclosure of personal beliefs and practices on the part of the plaintiffs is made by their complaint or is relevant here, beyond a belief that the Constitution forbids what the defendants are requiring pupils to do. Such a view might be held by a militant atheist, by a religiously indifferent agnostic, by an Evangelical, by a Jew, or by a Roman Catholic: any of these could be fervently devoted to maintaining the civil order, as declared by the Supreme Court.[4] Questions to any of these plaintiffs about their personal religious beliefs, or lack of such, are simply irrelevant; and such inquiries at trial to the (presumably masked) plaintiffs on these subjects should be, and I presume would be, disallowed. No man need give a second answer in our courts when his first has been, and rightly been, the Constitution. So much for this concern.
 
 
 35
 As for the presence here of plaintiffs who are children and the special deference due their vulnerability, here is use of the shield as a sword with a vengeance. These children are not necessary plaintiffs, need not have been joined at all, and are here by the choice of "Mary Roe" and her counsel. Parents have standing to complain of constitutional violations that affect their children and have often done so. Indeed, McCollom, cited above, was such a case, brought by a parent alone, as was Gobitis.[5] We should not so readily be taken in by a make-weight tactic. To be sure, of course, and as a practical matter, if parents incur sufficient opprobrium, it well may be that the children may suffer, whether made plaintiffs in the suit or not. Therefore, the argument advancing anonymity for the children comes down, again as practical matter, to that for permitting an anonymous suit by their parent. Their formal presence as plaintiffs adds nothing to it.
 
 
 36
 Intending no offense, it seems to me that such a startling procedure as an anonymous lawsuit deserves better underpinnings than are offered here. The majority tells our courts below little more than that, in future, we will decide the matter when it gets to us. Nothing objective is offered, "no hard and fast formula." But it is just such formulas, or at least a sketching of their outlines, that we sit to provide. Criminal proceedings, referred to in passing by the majority, stigmatize ultimately. Do we here adumbrate a succession of styles in the mode of "State v. Doe?" One may, moreover, search the annals of school desegregation and civil rights cases in vain before finding "Roe v. Connor" or "Doe v. Wallace." Those who brought those cases were willing to avouch their causes before the world. Indeed, if the Supreme Court has ever countenanced anonymous litigation in a case where the point was contested, I am unaware of it.
 
 
 37
 Even so, in closing, I acknowledge the possibility that school-yard bullies and all those other infinite torments to which a school child is subject may be present here, waiting in the wings. Once these Furies are loosed, they cannot be recalled. It may be anachronistic to observe as well that standing up to such menaces has long been celebrated in song and story as both the price and the seedbed of fortitude. My brothers would cut that price; perhaps it should be cut.
 
 
 38
 I waver on the edge; there is something to be said, I think, for the notion that one who strikes the king should do so unmasked or not at all. I need not decide; in my view, the showing made here is insufficient on any mode of reckoning. Sadly, moreover, a broad and probably fertile new source of Cohen-type appeals is opened today, appeals to be decided by us, as we today announce, by the way they happen to strike us as they are presented from time to time: a "case-by-case basis." Such courts as ours were, I read, instituted to declare law, so as to lighten that burden on the Supreme Court and to provide guidance for trial courts and for the bar. To say that we will do as we will do, as in effect we say here, does not advance that enterprise very greatly. I would affirm because the showing below for such extraordinary relief as we here grant was all but entirely lacking. I therefore respectfully dissent.
 
 
 
 [1]
 Affidavit of V. J. Stegall; defendant's exhibit II, Record at 38-39
 
 
 [2]
 Affidavit of E. L. Perritt; defendant's exhibit I; Record at 36-37
 
 
 [3]
 The district court did not consider the propriety of class action treatment for this claim before issuing the order from which this appeal was taken
 
 
 [4]
 Chapter 374 of the Acts of the 1979 Mississippi Legislature, codified at Miss.Code Ann. § 37-13-4 (Supp.1980), provides:
 It shall be lawful for any teacher in any of the schools of the state which are supported, in whole or in part, by the public funds of the state, to permit the voluntary participation by students and others in prayer. Nothing contained in this section shall authorize any teacher or other school authority to prescribe the form or content of any prayer.
 
 
 [5]
 The plaintiffs urge that this procedure gives both the court and the defendants every opportunity to scrutinize their standing to sue and to proceed with any necessary discovery. See Record at 51
 
 
 [6]
 The plaintiffs offered several documentary exhibits to bolster their assertions that they might be subjected to retaliatory harassment or violence if their identities were publicly revealed. The exhibits include local newspaper reports of public reaction to the lawsuit voiced at a Rankin County School Board meeting. An excerpt from one of these news clippings indicates the basis for the Does' fears:
 School board member G______ R______ contended that the suit was filed because C______ R______, Central Mississippi Legal Services Attorney, is Jewish.
 "R______ is a Jew. He wants to destroy Christianity because it is detrimental to his religion," R______ said.
 Agreeing with R______ was board president B______ S______, who said, "The lawsuit was filed because they want to abolish prayer, not to protect the constitution. We're picked on because we're so close to Jackson and so easy for them to get to." The other three board members nodded assent.
 ....
 County residents attending the Monday night board meeting said they support the decision to fight for voluntary prayer.
 "I know that God is God and I know Satan is Satan," Mhhhhhh Khhhhhh of Brandon said. "Satan is here, working his evil on these people filing this suit. They should be ashamed of themselves."
 "God is fixing to come back. He'll show them," Khhhhhh said.
 "Amen," Rhhhhhh said. "I couldn't have said it better myself."
 "The devil is here," Khhhhhh wife said. "He's doing everything he can through these people trying to get prayer out of our school. Christians must beat the evil out of these people."
 "We have got to band together and whop this evil thing," Khhhhhh said. "God says we can."
 "Amen," Rhhhhhh said. "Hallelujah."
 "The next thing you know the Jews and the atheists won't let us have a Christmas or Easter holiday," Khhhhhh said. "Pretty soon they won't let us drive our cars to church."
 Jackson Clarion-Ledger, November 7, 1979 (Plaintiffs' exhibit no. 2). (full names were printed in the newspaper).
 
 
 [7]
 The consent decree provides, in part:
 
 
 [1]
 No prayer or other entreaty addressed to God shall be read, recited, or in any manner whatsoever given over the public address system in any school of the school district
 
 
 [2]
 There shall not be read, or in any manner whatsoever given over the public address system of any school within the school district any verses, passages, or contents whatsoever of any version of the Holy Bible
 
 
 [3]
 There shall not be read, or otherwise given over the public address system of any school within the school district any poem, song, story, or any other material whatsoever of a religious devotional nature
 
 
 [8]
 Neither party briefs the prospect that graduation of the Doe children from the Pelahatchie Middle School may moot the case. See DeFunis v. Odegaard, 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974). We proceed on the assumption that this is not a consideration
 
 
 [9]
 The documentary proof in the record before us presents conflicting accounts of the challenged practices at the Pelahatchie Middle School. In view of this factual conflict and the lack of factual findings by the district court, we cannot say that the district court abused its discretion in refusing to issue a preliminary injunction prohibiting activities beyond the scope of the consent decree. This question is remanded to the consideration of the district court
 
 
 [10]
 The Richmond Newspapers case addressed the closure of a criminal trial. The opinion by Chief Justice Burger expressly left open the question of the public's right to attend civil trials, but noted that "historically both civil and criminal trials have been presumptively open." 100 S.Ct. at 2829 n.17
 
 
 [1]
 "Christians must beat the evil out of these people." Read in context, however, see 182-183 n.6, the remark smacks more of fulmination than of serious intent to harm
 
 
 [2]
 Illinois ex rel. McCollum v. Board of Education, 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948)
 
 
 [3]
 (T)he cases affording plaintiffs anonymity all share several characteristics missing here. The plaintiffs in those actions, at the least, divulged personal information of the utmost intimacy; many also had to admit that they either had violated state laws or government regulations or wished to engage in prohibited conduct. Here, by contrast, to prove their case A-D need not reveal facts of a highly personal nature or express a desire to participate in proscribed activities. Furthermore, all of the plaintiffs previously allowed in other cases to proceed anonymously were challenging the constitutional, statutory or regulatory validity of government activity
 Southern Methodist University Association v. Wynne & Jaffe, 599 F.2d at 713 (footnote omitted, emphasis added).
 
 
 [4]
 Including the Apostle Paul: "You must all obey the governing authorities. Since all government comes from God, the civil authorities were appointed by God, and so anyone who resists authority is rebelling against God's decision, and such an act is bound to be punished." Romans 13:1, 2 (The Jerusalem Bible, 1966 ed.)
 
 
 [5]
 Minersville School Dist. v. Gobitis, 310 U.S. 586, 60 S.Ct. 1010, 84 L.Ed. 1375 (1940)