JOHN DOE *v.* DIOCESE CORPORATION ET AL.*

SUPERIOR COURT

* The file in this case having been sealed by order of the court, the docket number, names of counsel and date of decision have been intentionally omitted.

CORRADINO, J. The plaintiff in the present case has filed a motion for a protective order seeking to use a pseudonym for purposes of pretrial proceedings. The institutional defendants, which include several churches and a church diocese, have filed a similar motion and have also filed a request for the same status for the clergyman accused of sexually abusing the male plaintiff, who is now an adult. A hearing was held on this motion at which the plaintiff and his therapist testified. Two clergymen testified for the defendants.

The plaintiff testified to a period of sexual abuse beginning when he was twelve years old. The abuse allegedly lasted for seven years, until he was in college, and involved physical touching and explicit sexual acts. According to the plaintiff, hundreds of such acts of abuse took place. The plaintiff also claims that, while he was a high school freshman, the clergyman supplied him with marijuana and beer. The plaintiff claims he felt powerless to stop this situation because of the alleged abuser's status as a clergyman. The plaintiff claims that memories of the abuse are pervasive in his life, disturb his sleep and cause him to have feelings of shame and guilt.

The plaintiff wants to use a pseudonym because he wants to protect the names of his two brothers who were also abused by the same person. He also wants to protect the name of his parents, his wife and his child.

The plaintiff has never discussed this matter with his father and, although he discussed it with his mother and his brothers, he testified that he never went into any details. He also claims to have discussed the matter with a counselor at work and, in a general way, with two college friends. He has discussed it fully with his wife, with a therapist and with legal counsel.

The plaintiff claims to work for a conservative company and fears that his future will be jeopardized if the

information is disclosed. He does not want his colleagues or people he meets daily to learn about either the sexual abuse or about his drug and alcohol use as a minor. He pays for his own therapy without reporting it to an insurance company so that his employer will not learn about these matters.

The plaintiff feels that sexual abuse of children must stop, that it is important that people learn about it and that they understand that it can happen to them or to their children in their towns or in religious institutions.

A clinical psychologist testified on behalf of the plaintiff. He had met with the plaintiff twenty-one times between October, 1992, and the date of this hearing in the fall of 1993. He testified that the plaintiff has a great deal of shame and pain about the sexual abuse to which he claims to have been subjected. He believes the plaintiff suffers from post traumatic stress disorder and that when he is exposed to situations symbolizing or resembling traumatic events, the plaintiff has flashbacks and is subject to disassociative episodes related to the abuse. The psychologist testified further that the plaintiff fears that he will sexually abuse his child, and that, as a result of the abuse he endured, the plaintiff has suffered the losses of his childhood and his adolescence, his rights to normal psycho-sexual development and to sexual intimacy without guilt, together with damage to his self-image and his self-respect.

The plaintiff fears people know about the abuse, which he regards as shameful, and that they can see it on his face. He, therefore, isolates himself socially and distances himself in relationships.

The therapist feels that public exposure would have further traumatizing effects on the plaintiff's personal and professional life. He feels shame and humiliation and public exposure would increase the plaintiff's feelings of shame. Dealing with the shame would have to

become a focus of treatment. Public exposure would result in the plaintiff having to spend a tremendous amount of time in overcoming his feelings of shame and humiliation as opposed to seeing himself rather as a person who has been hurt by a perpetrator. These facts elicited at the hearing form the factual basis of the plaintiff's motion.

The defendant clerical institutions also seek pseudonym status. Two clergymen testified on behalf of the institutional defendants. Their request is that the diocese being sued be identified by a designation such as the W church corporation. In order effectively to provide institutional pseudonym status, the defendant institutions also seek pseudonym status for the clergyman accused of abuse, because, if his name is revealed, he can be publicly identified with the particular churches and with the diocese being sued, thus defeating the purpose of pseudonym status.

One experienced clergyman testified that each of the churches and the defendant diocese are engaged in a variety of programs and activities that provide professional social, counseling, instructional and other support services to fill the needs of thousands of people, including those suffering from traumatic stress disorder. Public disclosure of highly sensitive, unproven allegations would undermine and harm the trust placed by the public in the defendants institutions. That trust is necessary for them to fulfill their efforts and to deliver the services just mentioned. People would also back away from participation in the programs provided by these churches. Allegations of this nature would also affect the fundraising ability of the churches and, thus, their ability to provide services. A diocesan official testified that the diocese operates many schools attended by thousands of students whom it teaches moral responsibility and values. These schools are, in part, staffed by clergy, and publication of these unproven allegations

of sexual misconduct by a clergyman would undermine the trust that people have in those schools.

In view of these concerns, the parties have each moved for the right to use pseudonyms in the present case at least until the time of jury selection. At that time, the trial judge would be able to review the propriety of the continued use of pseudonyms.

The court will first discuss the cases illustrating the strong public interest in having open court procedures, including access to the names of litigants. Then, the court will review the claim of each side for the requested relief in light of the cases permitting the use of pseudonyms despite opposing public interest considerations.

In recent years the United States Supreme Court has held that various types of press and public exclusion from criminal proceedings are violative of first amendment rights. *Press-Enterprise Co.* v. *Superior Court of California*, 464 U.S. 501, 104 S. Ct. 819, 78 L. Ed. 2d 629 (1984); *Richmond Newspapers, Inc.* v. *Virginia*, 448 U.S. 555, 100 S. Ct. 2814, 65 L. Ed. 2d 973 (1980). Although its discussion was made in the context of the right of public access to a criminal trial, the court in *Richmond Newspapers, Inc.* v. *Virginia*, supra, 575, used broad language that has implications for the openness of civil proceedings: "The First Amendment, in conjunction with the Fourteenth, prohibits governments from 'abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.' These expressly guaranteed freedoms share a common core purpose of assuring freedom of communication on matters relating to the function of government."

The court noted further that at the time the bill of rights was passed, public trials were "regarded as one

of 'the inestimable advantages of a free English constitution of government.' " Id. At other times the court has said that "the First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw." *First National Bank of Boston* v. *Bellotti,* 435 U.S. 765, 783, 98 S. Ct. 1407, 55 L. Ed. 2d 707 (1978). The court has also held that there is "a First Amendment right to 'receive information and ideas' "; *Kleindienst* v. *Mandel,* 408 U.S. 753, 762, 92 S. Ct. 2576, 33 L. Ed. 2d 683 (1972).

All of these observations argue for public access to civil as well as criminal proceedings especially because the court has relied in these cases on a first amendment analysis. See J. Steinman, "Public Trial, Pseudonymous Parties: When Should Litigants Be Permitted To Keep Their Identities Confidential?" Hastings L.J. 3–18 (1985). The operation of the courts is certainly an aspect of the functioning of government so that public access to court proceedings should be protected on first amendment grounds.

Apart from any constitutional basis, there is a common law right for the public to have access to the courts and court proceedings. "[O]ne of the most conspicuous features of English justice, that all judicial trials are held in open court, to which the public have free access . . . appears to have been the rule in England from time immemorial . . . . E. Jenks, The Book of English Law (6th Ed. 1967), 73–74. In *Craig* v. *Harney,* 331 U.S. 367, 374, 67 S. Ct. 1249, 91 L. Ed. 1551 (1947), the court said: "A trial is a public event. What transpires in the court room is public property . . . . There is no special perquisite of the judiciary which enables it, as distinguished from other institutions of democratic government, to suppress, edit, or censor events which transpire in proceedings before it."

The common law right of access to civil as well as to criminal proceedings has been recognized. *Barron v. Florida Freedom Newspapers,* 531 So. 2d 113, 116 (Fla. 1988); *In re Shortridge,* 99 Cal. 526, 531, 34 P. 227 (1893). The Connecticut Supreme Court recognized this right when, in permitting the use of fictitious names in a civil proceeding, it said that this "privilege" ought to be "granted only in the rare case where the nature of the issue litigated and the interest of the parties demand it and no harm can be done to the public interest." *Buxton v. Ullman,* 147 Conn. 48, 60, 156 A.2d 508 (1959), appeal dismissed, 367 U.S. 497, 81 S. Ct. 1752, 6 L. Ed. 2d 989 (1961).

It has been said that the public's right to attend trials and its right to know the identity of the parties is not "perfectly symmetrical" and pseudonym status neither obstructs nor interferes with the public's view of the "issues joined or the court's performance in resolving them." *Doe v. Stegall,* 653 F.2d 180, 185 (5th Cir. 1981). *Doe v. Stegall,* supra, however, recognized that even granting anonymity without closure of a trial has "constitutional overtones" and can only be granted if the need for anonymity "overwhelms the presumption of disclosure mandated by procedural custom." Id. In any event, *Buxton v. Ullman,* supra, 147 Conn. 48, makes clear that the request for the use of a pseudonym itself, apart from any issue as to whether a courtroom should be closed, implicates important rights that the public has to full access to information about court proceedings.

All of this means that a strong showing must be made before a party should be allowed to proceed anonymously. It is not a right the parties have as against each other; the court must determine the question as against the demands of the public interest. In the appropriate case, as was done here, an evidentiary hearing may

have to be held to decide the issue. Each motion for a protective order will now be discussed separately.

A good summary of this area of the law is set forth in *Doe* v. *Rostker,* 89 F.R.D. 158 (N.D. Cal. 1981). The court, in discussing rule 10 (a) of the Federal Rules of Civil Procedure, which reflects the common law interest in public access to the courts by requiring a complaint to name all parties, said: "Courts have carved out limited exceptions to Rule 10 where the parties have strong interests in proceeding anonymously. . . . The common thread running through these cases [permitting pseudonyms] is the presence of some social stigma or the threat of physical harm to the plaintiffs attaching to disclosure of their identities to the public record." Id., 161. "A plaintiff should be permitted to proceed anonymously in cases where a substantial privacy interest is involved. The most compelling situations involve matters which are highly sensitive, such as social stigmatization, real danger of physical harm, or where the jury litigated against would occur as a result of the disclosure of the plaintiff's identity. That the plaintiff may suffer some embarrassment or economic harm is not enough. There must be a strong social interest in concealing the identity of the plaintiff." Id., 162.

Several courts have stated a rule that reflects the policy of our Supreme Court in *Buxton* v. *Ullman,* supra, 147 Conn. 48. "The ultimate test for permitting a plaintiff to proceed anonymously is whether the plaintiff has a substantial privacy right which outweighs the 'customary and constitutionally-embedded presumption of openness in judicial proceedings.' " *Doe* v. *Frank,* 951 F.2d 320, 323 (11th Cir. 1992); *Coe* v. *United States District Court For District of Colorado,* 676 F.2d 411, 414 (10th Cir. 1982); *Southern Methodist University Assn.* v. *Wynne & Jaffe,* 599 F.2d 707, 712 (5th Cir. 1979); *Free Market Compensation* v. *Commodity*

*Exchange,* 98 F.R.D. 311 (S.D. N.Y. 1983); *Doe* v. *Deschamps,* 64 F.R.D 652 (D. Mont. 1974).

The most common instances where parties have been allowed to proceed anonymously are cases involving birth control or abortion issues. *Buxton* v. *Ullman,* supra, 147 Conn. 48; *Doe* v. *Deschamps,* supra, 64 F.R.D. 652; homosexuality or transsexuality, *Doe* v. *Blue Cross & Blue Shield of Rhode Island,* 794 F. Sup. 72 (D.R.I. 1992); *Doe* v. *Chafee,* 355 F. Sup. 112 (N.D. Cal. 1973); cf. *Doe* v. *United Services Life Ins. Co.,* 123 F.R.D. 437 (S.D. N.Y. 1988); illegitimate or abandoned children, *Doe* v. *Carleson,* 356 F. Sup. 753 (N.D. Cal. 1973); *Doe* v. *Shapiro,* 302 F. Sup. 761 (D. Conn. 1969); custody of children, *Doe* v. *Borup,* 500 F. Sup. 127 (E.D. Wis. 1980); challenge to religious observances, *Doe* v. *Stegall,* 653 F.2d 180 (5th Cir. 1981).

To paraphrase the reasoning if certainly not the particular facts of the well-reasoned case of *Doe* v. *Blue Cross & Blue Shield of Rhode Island,* supra, 794 F. Sup. 72, the plaintiff here would certainly appear to have a substantial privacy interest at stake. One's sexual history and practices are among the most intimate aspects of a person's life. When one has a sexual history falling outside the realm of the "conventional," that privacy interest is enhanced greatly, whether one has created that history voluntarily or it is forced upon a person as a result of abuse. The plaintiff's privacy interest is also underlined by his claim that the abusive relationship he alleges to have suffered involved the illegal use of alcohol and controlled substances.

But beyond these obvious and general considerations, in deciding how to weigh the privacy interests of the plaintiff against the public interest in disclosure of his identity at this stage of the proceedings, the court must examine the particular circumstances of the plaintiff. *Doe* v. *Stegall,* supra, 653 F.2d 186; *Barron* v. *Florida*

*Freedom Newspapers,* supra, 531 So. 2d 119; see also *Roe* v. *Borup,* supra, 500 F. Sup. 130, where the court considered "significant psychological harm" as a factor in deciding to allow the use of pseudonyms by both parents and child in a case where the child was removed from the parents' custody because of allegedly false charges of sexual abuse.

Here, the plaintiff seemed to express real concern and fear of shame and humiliation if he received public exposure. This not only related to his job situation, which might be dismissed as only an economic concern, but also to his desire that friends, acquaintances and even family not know all the details of the experiences he alleges. He has not told even close family members of these matters or has only alluded to them in a general way. His resort to therapy at his own expense seems to underline the seriousness of these experiences for him. His therapist, as discussed previously, strongly recommends against public exposure at this time, testifying that it would create real problems in the plaintiff's therapy.

As against the substantial privacy interest that the plaintiff has at this stage of the proceedings, it is difficult to see what public interest there would be in having the plaintiff's name revealed. The public will have access to all the records of the case, just not the plaintiff's real name.

Also, the fact that the plaintiff is suing for monetary damages should not affect his claim to proceed anonymously. A party should not have to lose the right to protect his or her privacy interest because that party has used the courts to secure the only relief—monetary damages—that might be appropriate or available. This is especially so when the claimed injury is not related to economic loss but involves claims of personal and

psychological suffering that has occurred in the past and is not amenable to injunctive or other equitable relief.

In conclusion, although the court believes the plaintiff should now prevail on his motion, the court's decision is subject to further review at the time of jury selection. The powerful reasons to allow full public access including revelation of the names of the parties as set forth in 6 J. Wigmore, Evidence (Chadbourn Rev. 1976) § 1834 et seq., would then come into play since it is at the time of the trial when the claim is going to be tested in a public adversary setting.

It should be noted that the protection given the plaintiff by granting this motion should be withdrawn if he goes into the public forum telling people in general about his experience. This would not constitute a burden on any first amendment rights he might have, but merely reflects a diminution in his privacy interest brought about by his own voluntary activities.

The defendant institutions present an appealing argument. It is in fact true, as the hearing established, that each church and the diocese as a whole, especially through its schools, performs socially valuable work, important for society and the thousands of individuals who use those services. It is also true that the allegations made in the present case are completely unproven and that this matter could go on for years in the courts before it is resolved.

The court, however, must refer to observations made previously and make its decision on the basis of the strong public interest in public access to the courts and court proceedings. This public interest touches on rights related to first amendment concerns. Parties cannot agree between themselves as to whether one or both should have pseudonym status, and the fact that pseudonym status has been given to one party, does not

mean that the other party is entitled to identical treatment. The court must make its determination by weighing the request for anonymity of each party separately against the public interest in open access to the courts.

In one of the leading cases, *Southern Methodist University Assn.* v. *Wynne & Jaffe,* supra, 599 F.2d 713, the court uses the following language: "[T]he mere filing of a civil action against other private parties may cause damage to their good names and reputation and may also result in economic harm. Defendant law firms stand publicly accused of serious violations of federal law [sex discrimination in hiring practices]. Basic fairness dictates that those among the defendants' accusers who wish to participate in this suit as individual party plaintiffs [women's law association and individual women attorneys] must do so under their real names."

This language cannot be authority for the notion that if the plaintiff is granted anonymity, the defendants must also be given that status, nor for the position that if one party is denied this treatment, neither party can secure it. In *Southern Methodist University Assn.* v. *Wynne & Jaffe,* supra, 599 F.2d 707, the plaintiffs were not trying to protect a sensitive interest of personal privacy. They wanted anonymity only because they feared economic hardship and reprisal. If that is the basis of the request it is only fair in a case where the defendants were not even requesting anonymity that the court should consider the economic harm caused by the suit to the defendants. Besides, fear of economic damage has not been considered by the courts as a reason to grant party anonymity. Id.; *Doe* v. *Hallock,* 119 F.R.D. 640, 644 (S.D. Miss. 1987); *Doe* v. *Rostker,* supra, 89 F.R.D. 162.

In the instance where a plaintiff presents a credible case for anonymity based on neither economic harm nor on hope of gain but, rather, on concerns for sub-

stantial privacy interests, the court should not consider whether it might give the same relief to the defendant. To do so unfairly treats the privacy claim and allows the introduction of considerations having no relevance to the merits of the plaintiff's particular claim, which should stand or fall on its own.

On the other hand, to grant the defendants pseudonym status because of the mere fact that the plaintiff has received it would allow a court to avoid the weighing process required by *Buxton* v. *Ullman,* supra, 147 Conn. 48, and all the other cases cited. A quid pro quo analysis is not appropriate to any decisional process that tries to resolve important questions pitting a party's request to proceed anonymously against the public interest in access to information about court cases and proceedings.

Turning to the merits of the defendants' request, the court has previously referred to and discussed several cases that allow party anonymity. It is clear that the theory behind these cases is that protection will be given to an individual litigant when a substantial interest in the right to personal privacy might be otherwise compromised. Institutions like the defendants cannot make a claim of harm to a personal privacy interest if they are not allowed to proceed pseudonymously.

Furthermore, this is not a case where a business seeks anonymity alleging that unless such status is granted, harmful confidential information or trade secrets will be revealed. Cf. *Doe* v. *A Corp.,* 709 F.2d 1043 (5th Cir. 1983). The defendants' request for relief is not based on a claim of economic harm as such. The defendant churches and diocese raise novel issues not discussed in the cases cited or in any other cases of which the court is aware. These arguments cannot be dismissed by saying that they do not fit into the privacy "pigeonhole" relied on by courts in granting this type of relief.

The defendants provide care and assistance to thousands of people in a variety of areas, including mental health and family counseling. They educate thousands of children and the defendants' witnesses testified to the harm they believe they will suffer if the defendants are not also allowed to proceed anonymously.

Even if it is assumed that the court should not limit this type of relief to situations involving intimate issues of personal privacy, however, the defendants' reasons for proceeding anonymously are not persuasive.

For one thing, what is the limit to their claim? Any charitable institution or religious institution sued because of the actions of its employees, servants or clergy could, presumably, come into court and claim party anonymity because of the harm disclosure would do to its very worthwhile activities. Should the protection be granted to cases where sexual or racial discrimination is alleged? Should the decision turn on the amount of charitable activity engaged in by the defendant institution; is a storefront church entitled to less protection than a larger religious institution?

From the testimony presented by the defendants' witnesses the court can conclude only that the damage that might result in the present case due to disclosure of the institutions' names is speculative both as to the nature of the harm and its duration. A previous incident involving another clergyman created, for example, an initial impact on youth participating in a religious service program, but the situation returned to normal in a few months. Perhaps statistics and evidence substantiating the harm alleged here is so intangible as to be not easily established.

Before the court should limit access to information about the identity of parties, however, more is needed than was presented here to establish the defendants' claim that this is that "rare case" where party

anonymity should be granted. *Buxton* v. *Ullman,* supra, 147 Conn. 60. In part it is a proof problem. When an individual claims protection because of the revelation of intimate matters affecting privacy rights, it is easier for a court to ascertain the impact of disclosure on the particular individual especially where there is testimony from the party or even from a professional who is treating the individual in question.

A key reason for the court not to allow anonymity to the defendants, however, is not just the court's view concerning the claim of harm being asserted. It is the importance of the other factor that must be balanced in the scale—the public interest.

Thus, one court was reluctant to allow anonymity even to an individual party (state judge) because he was a "public figure"; the court said, "the public interest in the conduct of its business by public officials is of paramount importance." *Doe* v. *United States Department of Justice,* 93 F.R.D. 483, 484 (1982). It seems to the court that the public has an interest in the functioning and operation of large religious or charitable institutions whose activities in some cases, such as here, affect the lives of thousands of people.

Also, there is a final consideration. *Lindsey* v. *Dayton-Hudson Corp.,* 592 F.2d 1118, 1125 (10th Cir. 1979), held that the trial court did not err in refusing to allow the use of a pseudonym by the plaintiff. The action was one for malicious prosecution. The court noted that the plaintiff had already suffered the publicity and embarrassment of a criminal trial. There, as here, the court cannot be blind to the situation the defendants find themselves in. Numerous allegations of improprieties similar to what has been alleged here have been made in this state and throughout the country. A fairly recent incident with similar allegations, apparently well known in the community, was alluded

to by counsel in the argument on this matter. How can the court speculate as to the amount of *added* harm revelation of the identity of these defendants will do and use that will-of-the-wisp conjecture to conclude that that speculative harm outweighs the public interest in learning of the existence of a suit against institutions educating and counseling thousands of its citizens? To put forth the question, for the court at least, provides the answer—a protective order should not issue on behalf of the defendant institutions and diocese nor on behalf of the clergyman accused in these incidents. Such protection was sought for him only to protect the identity of the defendant institutions.

The court rules that the plaintiff's motion for a protective order is granted. In light of the public interest involved, however, the court understands that this, in effect, means only that his name is to be deleted from any materials otherwise open to the public. Also, the motion is granted on the basis that it is made prior to jury selection. In light of the public interest concerns, at that time the trial court on its own motion should review the propriety of continuing the present court order.

The defendants' motion is denied but the court is concerned about the fact that its action affects important rights of the defendant that would be lost irreparably if review had to await final judgment. Under the so-called "collateral order doctrine" as set forth in *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 546–47, 69 S. Ct. 1221, 93 L. Ed. 1528 (1949), a court order is an appealable "final decision" when it represents "a final disposition of a claimed right which is not an ingredient of the cause of action and does not require consideration with it" and which presents "a serious and unsettled question" of law. These defendants make a request as institutions; whether they can secure pseudonym status and the standards for grant-

ing it, since it is not being requested by individuals, is certainly "unsettled" because there are no cases dealing with their precise claims. An important right is at stake and if this court is wrong, that irreparable right may be lost without the chance for review. It would seem unfair not to permit the defendants the opportunity to appeal the denial of their request in light of the fact that they can certainly make it under *Buxton* v. *Ullman,* supra, 147 Conn. 48; see *Southern Methodist University Assn.* v. *Wynne & Jaffe,* supra, 599 F.2d 711–12.

In light of these considerations, although the court denied the defendants' motion, the effective date of the court order will be May 16, 1994, so that the defendants can, if they so desire, consider the possibility of appeal.