John DOE, Petitioner,

v.

IMMIGRATION AND NATURALIZATION SERVICE, UNITED STATES DEPARTMENT OF JUSTICE, Respondent.

No. 86–3509.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 11, 1987.

Decided Feb. 2, 1989.

---

DAVID A. NELSON, Circuit Judge.

John Doe,[1] a student from the People's Republic of China, appeals from a decision of the Immigration and Naturalization Service ("INS") finding him ineligible for asylum and ordering him deported. Mr. Doe was converted to Christianity after his arrival in this country, and in the course of his stay here he has spoken out extensively against the anti-religious atmosphere in China. The State Department's Bureau of Human Rights and Humanitarian Affairs issued an advisory letter that evaluated his eligibility for asylum without addressing Mr. Doe's recent religious activities. Mr. Doe argues that INS abused its discretion in rendering its decision without benefit of State Department advice on the key factual issue presented by this file. We find Mr. Doe's argument meritorious, and we also find that Mr. Doe's eligibility for asylum was evaluated under too restrictive a standard. The matter will therefore be remanded for further proceedings.

I

Mr. Doe, a professional person in the People's Republic of China, was admitted to the United States under a non-immigrant student visa in order to pursue an advanced degree at an American university. He had been allowed to leave China under a program requiring such persons to provide their own funding. Appropriate financial arrangements had been made with a relative in this country. When Mr. Doe arrived here, the relative and other family members refused to help. Mr. Doe subsequently joined a Christian church, which provided financial assistance enabling him to obtain his degree.

The INS instituted deportation proceedings against Mr. Doe about a year and a half after his arrival. In the course of those proceedings Mr. Doe submitted requests for withholding of deportation and for asylum, claiming that if he returned to China he would be persecuted for two independent reasons. First, he stated that be-

John E. English (argued), Detroit, Mich., for petitioner.

Robert Kendall, Jr., Civ. Div., Office of I.N.S., Stewart Deutsch (argued), Washington, D.C., Anthony Nyktas, U.S. Atty., Cincinnati, Ohio, for respondent.

Before NELSON and BOGGS, Circuit Judges, and EDWARDS, Senior Circuit Judge.

---

1. Although the use of pseudonyms is not favored, we have resorted to it here to protect the petitioner's family, who remain in China, from possible reprisals. See *United States v. Doe,* 556 F.2d 391, 393 (6th Cir.1977); *United States v. Doe,* 655 F.2d 920, 922 n. 1 (9th Cir.1980).

cause of his past activities and those of his relatives in China he had been labelled a "black person" by the Chinese authorities. (A "black person," in Chinese parlance, is a person with a record of political offenses.) Some of Mr. Doe's relatives had been tortured and killed. Second, he alleged that he would be subject to persecution because he is now a devout Christian and has spoken out extensively against the anti-religious atmosphere in China.

As required by the INS regulations, a letter was sent to the State Department's Bureau of Human Rights and Humanitarian Affairs asking it to comment on petitioner's request for asylum. The Bureau responded that Mr. Doe did not have a well-founded fear of persecution:

> *"Reason:* The applicant, like millions of other Chinese, has experienced considerable hardship in China, especially during the so-called Cultural Revolution. The Chinese government has acknowledged that widespread abuses of power occurred during those years and has taken steps to correct such abuses of authority. For example, a new legal code has been promulgated and hundreds of thousands of persons persecuted during the period have been publicly rehabilitated and, in many cases, recompensed for their sufferings.
>
> In our view, the applicant, who has been issued a passport and has been authorized to travel to the United States, would not face persecution upon return to the PRC. The very issuance of these documents would indicate that the applicant is not of particular interest to the government."

The Bureau's letter also stated that it would be "pleased to consider" any "additional information" that might be presented.

Mr. Doe filed a motion asking the immigration judge to refer his case back to the Bureau because "the decision of [the Bureau] does not address the most important time phase (post U.S. arrival activities and events) upon which respondent's claim of reasonable well-founded fear of persecution was premised." The petitioner added

"[t]hat this matter has been presented to Chief Legal Officer of the Immigration Service who has stated that they concur in the Motion."

The motion for reconsideration was also premised on new evidence which Mr. Doe had not previously disclosed to his attorney because he was afraid the attorney was working for the immigration authorities. This new information was set forth in an affidavit in which the petitioner explained:

> "If I would return to China, I would most certainly be questioned under their torture procedures to get me to confess to these offenses against China. They would certainly want to know where I got my money for my education in the United States after my relatives would not pay for me. They would find out it came from the church and my religious activities. There is no way a person can resist their interrogation. They would then find out about my religious conversion, their financial support and religious activism here in the United States. Supporting a foreign religion is a religious offense against the State. I would be branded an enemy of the State as a foreign reactionary agent for these religious groups. I would expect that they would then torture me until they found out all about my other secret anti-Mao and anti-communist activism before I left. They have very effective ways of making a person talk and confess, and I have never heard of anyone who could resist them."

In his affidavit, petitioner also describes his participation in anti-communist groups in China. He claims, among other things, to have written three anti-communist books.

Mr. Doe says that since he has arrived in the United States his letters to former associates in China have gone unanswered—a circumstance that "alarms me and causes me to be concerned for our safety." His wife's letters indicate that she never received his letters to her, which makes him "sure my letters were intercepted by the Government as part of their watching me

as a bad person and as a suspected enemy of the Revolution."

The immigration judge declined to request a second opinion from the State Department. Noting that one of the affidavits supporting Mr. Doe's motion was from the attorney of record, the immigration judge commented that "this raises an interesting issue since the attorney's testimony or statements are not considered by the Board of Immigration Appeals as evidence upon which a decision should be based." (An affidavit from Mr. Doe himself was ignored.) The immigration judge offered as a second reason for denying the motion that "this court has no authority to challenge a sister agency such as the Department of State...."

In ruling on the merits of petitioner's application for asylum, the immigration judge found that Mr. Doe feared that he would be persecuted upon return but noted that "the respondent has relied on his own uncorroborated statements and on various letters and on various supplemental documents and the various documents fail to identify the respondent as *the one person* against whom the Chinese government will act because of the specific reason given in the application." (Emphasis added.) The immigration judge also denied Mr. Doe's request for withholding of deportation.

The BIA affirmed the immigration judge's decision. In response to Mr. Doe's contention that the BIA failed to consider his religious activity, the opinion stated:

"The BHRHA had the information regarding the conversion when it rendered its opinion on December 14, 1983. We assume that the BHRHA either did not have any information regarding this issue or determined that it would be of no significance. In any case, we will not order a resubmission to the BHRHA. In *Matter of Exilus*, 18 I & N Dec. 276 (BIA 1982), we determined that interrogatories would not be submitted to the BHRHA regarding their opinion letters. We find that the respondent's request to be similar to an interrogatory and will deny the request. We also note that the regulations mandating the use of BHRHA opinion letters do not provide criteria for their form.

"Moreover, the respondent mistakes the role of the BHRHA opinion letter in the asylum and withholding of deportation application procedure. The letter is not determinative of the applications. By regulation, it must be received into evidence in accordance with 8 C.F.R. §§ 208.7 and 208.10. Regardless of the letter, the respondent can still make a successful claim, if he can establish a well-founded fear of persecution. The respondent has failed to do such."

The BIA took note of the immigration judge's finding that Mr. Doe held a subjective fear of persecution, but upheld the denial of refugee status because he had "failed to provide objective evidence that he will be persecuted due to his religion" and because there was "no adequate demonstration that the alien's claimed fear of persecution based on his political opinion is well-founded." The BIA held that Mr. Doe had not met the statutory standard of eligibility for asylum "regardless of whether his claim is assessed in terms of demonstrating a 'clear probability,' a 'realistic likelihood,' a 'reasonable possibility,' or a 'good' or 'valid reason to fear' persecution." It also denied Mr. Doe's request for withholding of deportation. Mr. Doe has appealed only from that part of the BIA's decision which found him ineligible for asylum.

## II

Section 208 of the Immigration and Nationality Act of 1952, as amended (codified at 8 U.S.C. § 1158(a)), requires the Attorney General to establish a procedure for considering applications for asylum filed by aliens physically present in the United States. The details of the procedure so established are found in 8 C.F.R. Part 208. That section also empowers the Attorney General to grant asylum, in his discretion, to any alien determined to be a "refugee" as that term is defined in 8 U.S.C. § 1101(a)(42). The relevant language in the latter section defines a refugee as

"any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."

On appeal, Mr. Doe challenges two different aspects of the decision denying him asylum. He first argues that the immigration judge abused his discretion in refusing to request a second advisory opinion from the State Department's Bureau of Human Rights and Humanitarian Affairs. He also argues that the determination that he was not a "refugee" is clearly erroneous. We examine these arguments in turn.

## A

INS is required by regulation to obtain an advisory opinion from the Bureau in all cases where there is a request for asylum. 8 C.F.R. § 208.7. The immigration judge must adjourn the hearing once an advisory opinion is requested. § 208.10(b). If a previous opinion has been requested, the immigration judge may not request a new opinion "unless circumstances have changed so substantially since the first opinion was provided that a second referral would materially aid in adjudicating the asylum request." *Id.*

In *McLeod v. INS,* 802 F.2d 89 (3d Cir.1986), the petitioner had argued that the failure of the immigration judge to seek a second advisory opinion from the Bureau after the overthrow of the Bishop government in Grenada violated the regulations. The court held that "[t]he decision as to whether to seek a second advisory opinion from the [Bureau] is within the discretion of the immigration judge." 802 F.2d at 94. In *Youssefinia v. INS,* 784 F.2d 1254 (5th Cir.1986), the petitioner submitted new evidence in support of his claim that he would be persecuted if forced to return to Iran and asked the immigration judge to request a new advisory opinion from the Bureau in light of the new evidence. By that stage of the proceedings, the immigration judge had already requested and obtained three advisory opinions concerning the petitioner's eligibility for asylum. The Fifth Circuit viewed the new evidence as merely cumulative and concluded that the immigration judge had not abused his discretion in failing to adjourn the hearing to request a fourth advisory opinion. *Id.* at 1259–60. "Because the immigration judge requested and received a *responsive* advisory opinion from [the Bureau], ... he was not required to make an additional request." *Id.* at 1260. (Emphasis added.)

These cases, the applicable regulations, and the actual advisory letter issued by the Bureau in this case all contemplate that a second letter might be requested if appropriate. The immigration judge's apparent impression that a request for a second letter would be an impermissible "challenge" to a sister agency is incorrect.

The State Department is asked to prepare advisory opinions in asylum cases because it has access to information about foreign conditions not necessarily available elsewhere. The regulations contemplate that even classified information may be furnished as "non-record" information not subject to disclosure to either the public or the petitioner. See 8 C.F.R. § 208.10(c). Although the immigration judge is not bound by the Bureau's opinion, the fact that an opinion must be obtained shows that it must be given consideration; the regulations do not contemplate that the State Department will be put to the trouble of recording its views so that the opinion may be filed unread. And if the opinion does not address the case at hand, it gives INS nothing to consider. If the Bureau's opinion is to be of any help to the immigration judge, it must, at a minimum, deal with the general type of situation confronting the particular alien whose case is being evaluated. We believe the immigration judge abused his discretion when he refused to request a responsive advisory opinion from the Bureau.

## B

■ Turning to the substance of the decision that Mr. Doe had no "well-founded fear of persecution" and was thus not a "refugee" eligible for asylum status, it is clear, as we said in *Dawood–Haio v. INS*, 800 F.2d 90 (6th Cir.1986), that:

> "The 'well-founded fear' standard prescribed by § 208 is 'more generous' to aliens than the 'clear probability' standard, *Youkhanna v. INS*, 749 F.2d 360, 362 (6th Cir.1984); *Dolores v. INS*, 772 F.2d 223, 226 (6th Cir.1985); *Yousif v. INS*, 794 F.2d 236, 243–44, [ (6th Cir. 1986) ] *supra,* because, as noted in *Dolores,* the 'well-founded fear standard ... can be satisfied by credible *subjective* evidence and ... the fear may be based upon group characteristics such as the petitioner's religion.' 772 F.2d at 226. (Emphasis supplied.)"

*Id.* at 96. (Deletions in original.) Whether an alien has a well-founded fear of persecution and thus comes within the statutory definition of a refugee eligible for asylum is a question of fact reviewable under the "clearly erroneous" standard. *Id.* at 97.

■ In *INS v. Cardoza–Fonseca,* 480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987), the Supreme Court explained:

> "Whether or not a 'refugee' is eventually granted asylum is a matter which Congress has left for the Attorney General to decide. But it is clear that Congress did not intend to restrict eligibility for that relief to those who could prove that it is more likely than not that they will be persecuted if deported."

*Id.* at 450, 107 S.Ct. at 1222. The Court stressed that "Congress had assigned to the Attorney General and his delegates the task of making ... hard individualized decisions; although Congress could have crafted a narrower definition, it chose to authorize the Attorney General to determine which, if any, eligible refugees should be denied asylum." *Id.* at 444–45, 107 S.Ct. at 1220. The requirement "[t]hat the fear ... be 'well-founded' does not alter the obvious focus on the individual's subjective beliefs, nor does it transform the standard into a 'more likely than not' one." *Id.* at 431, 107

S.Ct. at 1213. The Supreme Court also took note of various unsuccessful attempts to change the "well-founded fear" standard into a "well-founded fear in the opinion of the Attorney General" standard. Proponents of the unsuccessful amendment argued that the "well-founded fear" standard "would be entirely subjective." *Id.* at 442 n. 27, 107 S.Ct. at 1219 n. 27 (Western Hemisphere Immigration, Hearings on H.R. 981 before Subcommittee No. 1 of the Committee on the Judiciary, 93rd Cong., 1st Sess. 95 (1973) (statement of Hon. Francis Kellogg, Special Assistant to the Secretary of State)).

In the instant case, both the immigration judge and the BIA found that the petitioner had a subjective fear of persecution. The immigration judge found, however, that the fear was not well-founded because "the respondent has relied on his own uncorroborated statements and on various letters and various supplemental documents and the various documents fail to identify the respondent as *the one person* against whom the Chinese government will act because of the specific reason given in the application." (Emphasis supplied.) This is not the standard established by *Cardoza–Fonseca.* In concluding that Mr. Doe would fail to qualify for asylum "regardless of whether his claim is assessed in terms of demonstrating a 'clear probability,' a 'realistic likelihood,' a 'reasonable possibility,' or a 'good and valid reason to fear persecution,' " the BIA also appears to have applied a standard (or lack of standard) inconsistent with *Cardoza–Fonseca.* This is not a case where we can affirm a denial of refugee status that was based on application of an incorrect or unarticulated legal standard. See *Rodriquez v. INS,* 841 F.2d 865, 869 (9th Cir.1987).

It is true that this court has stated that "[t]he fact that the Board may have evaluated [the] request for asylum under the more stringent clear probability standard does not prevent us from affirming the order of deportation." *Gumbol v. INS,* 815 F.2d 406, 413 (6th Cir.1987). We are certainly not required to affirm a deportation order issued under an erroneous standard,

however, and both before and after *Gumbol*, we have remanded cases to the INS where the BIA's decision on a request for asylum was based on an incorrect or unspecified legal standard. See *Dawood–Haio v. INS*, 800 F.2d 90, 97 (6th Cir.1986); *Castaneda–Hernandez v. INS*, 826 F.2d 1526, 1531 (6th Cir.1987).

*Gumbol* is probably best understood as a "harmless error" case. The asylum request in *Gumbol* was based on "generalized information about human rights conditions in Iraq" and the petitioner's own unsubstantiated testimony about a single beating incident at his workplace in Iraq— testimony which the immigration judge explicitly found was not credible. 815 F.2d at 412. The BIA's failure to evaluate the request for asylum under the appropriate legal standard was harmless because the evidence in the record would have been insufficient to support a finding that the petitioner was a "refugee" eligible for asylum even under the less stringent "well-founded fear" standard. Such is not the case here; Mr. Doe's subjective fear was substantiated through detailed testimony explicitly found to be credible by the immigration judge.

Even if objective evidence of "well-foundedness" were required, the INS would not need to look far to find such evidence in this case. The administrative record contains the letter of a Jesuit priest who had visited China himself and had "rather extensive Jesuit sources" there. The letter describes the government's attempt to limit the practice of religion to that conducted by the Patriotic Association, an entity controlled by the government. The priest stated that he personally knew "priests and lay people who have been arrested and sent to labor camps for carrying out" Christian services not sanctioned by the Patriotic Association.

Although Article 36 of the 1982 Chinese Constitution states that citizens enjoy freedom of religious belief, it qualifies that statement by stating

"[t]he state protects normal religious activities. No one may make use of religion to engage in activities that disrupt public order, impair the health of citizens or interfere with the educational system of the state. Religious bodies and religious affairs are not subject to any foreign domination."

How these words may be applied in practice to such believers as Mr. Doe, an adherent of a Western religion who feels he has been called upon to "continue to spread the Lord's word," is something that cannot possibly be ascertained from the Constitution itself.

The petition for review is **GRANTED** and the case is **REMANDED** with instructions to obtain a responsive opinion on Mr. Doe's case from the State Department's Bureau of Human Rights and Humanitarian Affairs; to determine, under the appropriate standard, whether Mr. Doe is a "refugee" within the meaning of 8 U.S.C. § 1101(a)(42); and to make an informed exercise of discretion on his application for asylum, assuming Mr. Doe is in fact a refugee.