214 F.3d 1058 (9th Cir. 2000)
 DOES I THRU XXIII, on behalf of themselves and all others similarly situated, Plaintiff-Appellant,
v.
ADVANCED TEXTILE CORPORATION, a corporation; AMERICAN INVESTMENT CORPORATION, a corporation; AMERICAN PACIFIC TEXTILE, INC., a corporation; CONCORDE GARMENT MANUFACTURERS CORPORATION, a corporation; DIORVA (SAIPAN) LTD., a corporation; GLOBAL MANUFACTURING INC., a corporation; GRACE INTERNATIONAL INC., a corporation; HANSAE (SAIPAN), INC., a corporation; JOO ANG APPAREL, INC., a corporation; L & T INTERNATIONAL CORPORATION, a corporation; MARIANA FASHIONS, INC., a corporation; MARIANAS GARMENT MANUFACTURING, INC., a corporation; MICHIGAN, INC., a corporation; MICRONESIAN GARMENT MANUFACTURING, INC., a corporation; NEO FASHION, INC., a corporation; N.E.T., d/b/a Suntex Manufacturing Corporation, a corporation; PAN JIN SANG SA CORPORATION, a corporation; SAKO CORPORATION, a corporation; TOP FASHION CORPORATION, a corporation; TRANS ASIA GARMENT FORTE CORPORATION, a corporation; UNITED INTERNATIONAL CORPORATION, a corporation; US CNMI DEVELOPMENT CORPORATION, a corporation, Defendants-Appellees.
 No. 99-16713
 
 Office of the Circuit Executive
 U.S. Court of Appeals for the Ninth Circuit
 Argued and Submitted December 7, 1999--San Francisco, California
Filed June 2, 2000
 [Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted]
 Michael Rubin, Altshuler, Berzon, Nussbaum, Berzon & Rubin, San Francisco, California, for the plaintiffs-appellants.
 Stephen V. Bomse, Heller, Ehrman, White & McAuliffe, San Francisco, California, for defendants-appellees Advanced Textile Corporation, et al.
 G. Anthony Long, Long & Brown, Saipan, Mariana Islands, for defendant-appellee N.E.T.
 William Stone, United States Department of Labor, Washington, D.C., for amicus curiae Secretary of Labor.
 Appeal from the United States District Court for the District of the Northern Mariana Islands. D.C. No. CV-99-00002-ARM
 Alex R. Munson, District Judge, Presiding
 Before: Myron Bright,[1] Harry Pregerson and Michael Daly Hawkins, Circuit Judges.
 OPINION
 PREGERSON, Circuit Judge:
 
 
 1
 This case requires us to decide whether the named plaintiffs in a Fair Labor Standards Act, 29 U.S.C. S 201 et seq., collective action may, in the caption of their complaint, use pseudonyms in place of their true names. Plaintiffs in this case are foreign garment workers on the island of Saipan. They used fictitious names in their complaint because they fear that, if their identities are disclosed to defendants and other nonparties to this action, they will be fired from their jobs, deported from Saipan, and arrested and imprisoned by the People's Republic of China. The district court dismissed the action with leave to amend the complaint to state plaintiffs' true names. We have jurisdiction under the collateral order doctrine, and we reverse. We hold that where, as here, the named plaintiffs in a Fair Labor Standards Act collective action demonstrate that they have an objectively reasonable fear of extraordinarily severe retaliation, they may conceal their identities from defendants at least until the district court rules on plaintiffs' motion for court-ordered notice to potential class members,[2] and potential class members have been given an opportunity to join the suit.
 
 
 2
 * Saipan is the main island of the Commonwealth of the Northern Mariana Islands ("CNMI"), and garment manufacturing is one of Saipan's principal industries. The garment industry has flourished on Saipan because employers in Saipan are not obligated to pay the federal minimum wage, and clothing made in Saipan, a commonwealth of the United States, can be sold in the United States without payment of import duties. Nonresident foreign workers make up roughly half of Saipan's population, and as many as 25,000 may sew clothing for the garment industry. Induced to travel to Saipan by recruiting agencies operating abroad, foreign workers typically pay several thousand dollars to secure a job in Saipan, sign a contract agreeing to work only for a specific employer and to return home when employment ends, and reside in company housing while in Saipan.[3]
 
 
 3
 * Twenty-three workers in Saipan's garment industry filed this suit against their employers, alleging multiple violations of the Fair Labor Standards Act ("FLSA"). Specifically, plaintiffs allege that their employers have a pattern, practice, or policy of failing to pay overtime; failing to pay the legally required overtime; deducting excessive sums for unsanitary housing and food which plaintiffs are required to purchase as a condition of employment; and failing to keep adequate records. They named as defendants twenty-one garment manufacturers operating on the island.[4] The plaintiffs are all nonresidents of Saipan; twenty-one are citizens of the People's Republic of China ("China"), and two are citizens of Bangladesh.
 
 
 4
 Plaintiffs filed their complaint under the pseudonyms "Jane Does I-XXIII." The complaint alleges that plaintiffs "fear that if their true identity is revealed, they will face actual physical violence, the threat of physical violence, immediate deportation to China or their country of origin, likely arrest upon arrival in China or their country of origin and an order by China and other authorities accelerating the repayment of debt incurred for recruitment fees" and that they "reasonably fear that their families may face similar threats of physical and economic retaliation if their true identity is revealed."Plaintiffs filed this suit as a FLSA collective action on behalf of approximately 25,000 similarly situated garment workers. Section 16(b) of FLSA authorizes an employee to bring an action on behalf of similarly situated employees, but requires that each employee opt-in to the suit by filing a consent to sue with the district court. See 29 U.S.C. S 216(b).[5] To facilitate this process, a district court may authorize the named plaintiffs in a FLSA collective action to send notice to all potential plaintiffs, see Hoffman-La Roche Inc. v. Sperling, 493 U.S. 165, 169 (1989), and may set a deadline for plaintiffs to join the suit by filing consents to sue, id. at 172. Accordingly, plaintiffs in this suit moved the district court to authorize notice to be sent to all potential plaintiffs ("Hoffman-La Roche motion").
 
 
 5
 Before the district court ruled on plaintiffs' Hoffman-La Roche motion and while discovery was stayed, all defendants, except N.E.T. Corporation ("N.E.T."), moved to dismiss the complaint for failure to include plaintiffs' true names and to strike the consents to sue filed under seal. Plaintiffs then filed a cross-motion for leave to proceed under fictitious names. N.E.T. did not oppose plaintiffs' cross-motion. The district court denied plaintiffs' cross-motion and granted defendants' motion to dismiss. Instead of entering its order, the court stayed the dismissal to permit plaintiffs to amend their complaint to include their true names.[6] Plaintiffs appeal the dismissal of their action.
 
 
 6
 The district court concluded that plaintiffs' need for anonymity did not outweigh "the prejudicial effect on defendants' ability to investigate and defend against claims by unnamed plaintiffs," and the public's interest in a "case [of] widespread implications." The court gave five reasons for this conclusion. Citing Article III's standing requirement, the district court suggested that it lacked jurisdiction to protect plaintiffs from retaliation by nonparties to the suit. The court also described plaintiffs' evidence of threatened retaliation as "prospective and conjectural, based in large part on hearsay and innuendo." Third, the court found that plaintiffs' evidence did not demonstrate a "real danger of physical harm" and that "[m]any of the fears revolve around economic retaliation which is not sufficient to support anonymous proceedings." Fourth, the court observed that anonymity would serve no purpose because defendants already know the identities of many plaintiffs. Finally, the court stated that other protections are available to plaintiffs, including the United States marshal service, FLSA's prohibition on employer retaliation against employees who file labor complaints, 29 U.S.C. S 215(a)(3), and the CNMI's Non-Resident Workers Act, 3 N. Mar. I. Code S 4434(g), which prohibits summary deportation of foreign workers upon termination from their employment.
 
 B
 
 7
 In support of their motion to proceed under fictitious names, plaintiffs filed with the district court evidence of working conditions in Saipan's garment industry and the particular risks that Chinese workers face if their identities are disclosed.[7] Chinese workers are enlisted to work in Saipan's garment industry by recruiting agencies operating in China. Recruiters require prospective workers to sign side-contracts with the recruiting agency. One such contract requires the employee to surrender her passport upon entering Saipan and to return to China immediately if she quits work without the recruiter's permission. The recruiting agencies charge prospective workers a "recruitment fee" to secure a position in the CMNI and a "performance of contract" deposit which is forfeited if the worker does not complete her contract. These fees total several thousand dollars. In addition, prospective workers must find a guarantor, usually a relative, to assume joint liability for any debts owed by the worker.
 
 
 8
 Several workers testified that they fear the Chinese government will arrest them or their family members if they breach the recruitment contract, or if they are unable to pay the debts acquired under the recruitment contract. Recruiters warn workers, prior to departing China, that they must not complain about working conditions, speak to Americans, or criticize the Chinese government. Recruiters continue to meet with and police the conduct of their recruits after they arrive in Saipan. When workers complained about working conditions, their recruiters contacted family members in China and demanded that the family members pay fines. Some workers testified that they had been threatened with arrest for filing labor complaints, or that they knew others who had been threatened with arrest for doing so. Numerous workers testified that they fear the Chinese government will arrest them or their family members because they filed a complaint against their employer in Saipan. Plaintiffs also presented evidence that China's state secrets law has been used to prosecute and imprison workers for complaining about their working conditions abroad.
 
 
 9
 Finally, managers of defendants' factories have attempted to dissuade workers from complaining about their working conditions. Managers interrogated workers about whether they spoke to lawyers or filed complaints about working conditions, warned them not to complain, and threatened them with various reprisals, including termination, blacklisting, deportation, and closing the factory. There is also testimony that employers made oblique threats of physical harm to employees who complained about working conditions.
 
 
 10
 To refute plaintiffs' allegations, defendants submitted declarations by Chinese workers who had completed a tour in Saipan and testified that they experienced no work-related problems; declarations by Chinese workers who are currently employed in Saipan and who had filed labor complaints, stating that they suffered no retaliation as a result of filing those complaints; and evidence that plaintiffs in other FLSA actions against employers in Saipan's garment industry revealed their identities. Defendants also presented testimony by garment factory managers, recruiting agents, and the Chinese government, denying that they threaten or retaliate against workers who file labor complaints. Finally, defendants presented evidence that they had ascertained the identities of as many as ten of the twenty-three plaintiffs.
 
 II
 
 11
 We begin with the question of our jurisdiction to review the district court's order dismissing the case with leave to amend the complaint. Ordinarily, we do not have jurisdiction to hear appeals from nonfinal district court decisions. See 28 U.S.C. S 1291.[8] A final decision is one that " `ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.' " Coopers & Lybrand v. Livesay, 437 U.S. 463, 467 (1978) (quoting Catlin v. United States, 324 U.S. 229, 233 (1945)). The collateral order doctrine creates an exception to the final decision rule. This court may exercise its S 1291 jurisdiction to review a district court order that is not a final decision if three requirements are met. The order must "[1] conclusively determine the disputed question, [2] resolve an important issue completely separate from the merits of the action, and [3] be effectively unreviewable on appeal from a final judgment." Id. at 468; see also K. V. Mart Co. v. United Food & Commercial Workers Int'l Union, Local 324, 173 F.3d 1221, 1223 (9th Cir.), cert. denied, 120 S. Ct. 176 (1999).
 
 
 12
 The district court's order before us satisfies all three Coopers & Lybrand requirements. An order "conclusively determines the disputed question" if it is " `made with the expectation that [it] will be the final word on the subject addressed.' " Jackson v. Vasquez, 1 F.3d 885, 887 (9th Cir. 1993) (quoting Gulfstream Aerospace Corp. v. Mayacamas Corp., 485 U.S. 271, 276 (1988)). This requirement is satisfied because nothing in the district court's order suggests that the district court will reconsider its ruling that plaintiffs may not litigate this case under fictitious names. Contrary to the defendants' argument, the district court's decision to stay the dismissal of the suit in order to permit plaintiffs to amend their complaint has no effect on the finality of the order. The district court's order is final, even if it will not take effect immediately. See Moses H. Cone Memorial Hospital v. Mercury Constr. Corp., 460 U.S. 1, 12 (1983) (stating that there is no practical distinction between a stay and dismissal for the purpose of the collateral order doctrine).
 
 
 13
 The second Coopers & Lybrand requirement is also satisfied, as defendants concede, because the question whether plaintiffs may proceed anonymously is separate from the question whether defendants violated the federal wage and hour law.
 
 
 14
 The third Coopers & Lybrand requirement is that the district court order be "effectively unreviewable on appeal from final judgment." Midland Asphalt Corp. v. United States, 489 U.S. 794, 799 (1989). This means that " `the legal and practical value of [permission to proceed anonymously will] be destroyed if [ ] not vindicated before trial.' " Id. (quoting United States v. MacDonald, 435 U.S. 850, 860 (1978)). Plaintiffs have also fulfilled this requirement. If plaintiffs amend their complaint to reveal their identities and litigate their FLSA claims under their true names, the question whether plaintiffs may use pseudonyms will be moot. Appellate review of the district court order after the district court renders a final decision on the FLSA claims will have no legal or practical value.
 
 
 15
 Defendants argue, however, that the district court's order can be reviewed on appeal from the final judgment. If plaintiffs do not amend their complaint prior to the expiration of the stay order, the district court will enter a final decision dismissing their complaint, and that order will be appealable under S 1291. Defendants correctly point out that a district court order dismissing a case with leave to amend is not appealable under S 1291 as a final decision. See WMX Technologies, Inc. v. Miller, 104 F.3d 1133, 1135 (9th Cir. 1997) (en banc); Santoro v. CTC Foreclosures Svcs. Corp., 193 F.3d 1106, 1107 (9th Cir. 1999). We have never decided whether the WMX Technologies rule applies when a plaintiff appeals a district court's order under the collateral order doctrine.
 
 
 16
 The WMX Technologies rule is consistent with the longstanding principle that finality is a condition of appellate review. See 104 F.3d at 1136 ("[T]he rule we reaffirm today . . . provides for a final look before the arduous appellate process commences."). The collateral order doctrine also requires finality: the district court's order must "conclusively determine the disputed question." Coopers & Lybrand, 437 U.S. at 468. But the essential feature of the collateral order doctrine -that which distinguishes it from ordinary appellate review under S 1291 -is that the collateral order doctrine permits appellate review of final orders prior to the entry of a final judgment. Thus, a rule requiring plaintiffs to obtain a final judgment on a collateral issue that is completely separate from the merits of the dispute would defeat the central purpose of the collateral order doctrine.
 
 
 17
 Our decision not to apply the WMX Technologies rule to collateral orders of the district court produces a fair result in the case before us. Requiring plaintiffs to obtain a final decision dismissing their case prior to appellate review of the anonymity question would place plaintiffs in a Catch-22. If plaintiffs amend their complaint to state their true names, plaintiffs will lose the opportunity to have the anonymity question decided by an appellate court. Plaintiffs could obtain immediate review by not amending their complaint and instead allowing the district court to enter a final judgment. But if they lose on appeal of the anonymity issue, they will have lost the option to pursue their FLSA claims under their real names because the district court will have already entered a final judgment dismissing the case. A plaintiff seeking review under S 1291 of a final decision does not face the same quandary.
 
 
 18
 In sum, we conclude that the district court's order satisfies all three Coopers & Lybrand criteria and as a result, we have jurisdiction to hear plaintiffs' appeal. In reaching this conclusion, we join two of our sister circuits that have exercised jurisdiction in similar circumstances. See James v. Jacobson, 6 F.3d 233, 237 (4th Cir. 1993) (district court order prohibiting plaintiffs from testifying anonymously at trial is an appealable order); Doe v. Stegall, 653 F.2d 180, 183 (5th Cir. 1981) (trial court order granting plaintiffs leave to amend their complaint to add more plaintiffs, but requiring that additional plaintiffs' identities be disclosed, is appealable under the collateral order doctrine); Southern Methodist Univ. Ass'n of Women Law Students v. Wynne & Jaffe, 599 F.2d 707, 711 (5th Cir. 1979) (same).
 
 III
 
 19
 Plaintiffs' use of fictitious names runs afoul of the public's common law right of access to judicial proceedings, see Nixon v. Warner Communications, Inc., 435 U.S. 589, 598-99 (1978); EEOC v. Erection Co., Inc., 900 F.2d 168, 169 (9th Cir. 1990), and Rule 10(a)'s command that the title of every complaint "include the names of all the parties, " Fed. R. Civ. P. 10(a). Nevertheless, many federal courts, including the Ninth Circuit, have permitted parties to proceed anonymously when special circumstances justify secrecy. See, e.g., Doe v. Madison School Dist. No. 321, 147 F.3d 832, 833 n.1 (9th Cir. 1998), vacated on other grounds, 177 F.3d 789 (9th Cir. 1999) (en banc); Doe v. Blue Cross & Blue Shield United of Wisconsin, 112 F.3d 869, 872 (7th Cir. 1997); James, 6 F.3d at 239; Doe v. INS, 867 F.2d 285, 286 n.1 (6th Cir. 1989) ("Doe I"); Stegall, 653 F.2d at 186; Moe v. Dinkins, 533 F.Supp. 623, 627 (S.D.N.Y. 1981), aff'd, 669 F.2d 67 (2d Cir. 1982).[9]
 
 
 20
 In this circuit, we allow parties to use pseudonyms in the "unusual case" when nondisclosure of the party's identity "is necessary . . . to protect a person from harassment, injury, ridicule or personal embarrassment." United States v. Doe, 655 F.2d 920, 922 n.1 (9th Cir. 1981) ("Doe II") (using pseudonyms in opinion because appellant, a prison inmate,"faced a serious risk of bodily harm" if his role as a government witness were disclosed); see also Madison School Dist., 147 F.3d at 834 n.1 (stating that plaintiff filed case as "Jane Doe" because she feared retaliation by the community). We have not, however, decided an appeal from a district court's order granting or denying permission to proceed anonymously. As a result, we have had no opportunity to set out the legal standard governing a district court's discretionary decision to permit a party to proceed anonymously.[10]
 
 
 21
 Four federal Courts of Appeals have heard appeals from a district court's order refusing to allow plaintiffs to use pseudonyms. These courts held that a district court must balance the need for anonymity against the general presumption that parties' identities are public information and the risk of unfairness to the opposing party. See M.M. v. Zavaras , 139 F.3d 798, 803 (10th Cir. 1998); James, 6 F.3d at 238 (Fourth Circuit); Doe v. Frank, 951 F.2d 320, 323-24 (11th Cir. 1992); Stegall, 653 F.2d at 186 (Fifth Circuit). Applying this balancing test, courts have permitted plaintiffs to use pseudonyms in three situations: (1) when identification creates a risk of retaliatory physical or mental harm, see Stegall, 653 F.2d at 186; Gomez v. Buckeye Sugars, 60 F.R.D. 106, 107 (N.D. Ohio 1973) (permitting FLSA plaintiffs to use pseudonyms to protect them from employer reprisals); (2) when anonymity is necessary "to preserve privacy in a matter of sensitive and highly personal nature," James, 6 F.3d at 238; see also Doe v. United Services Life Ins. Co., 123 F.R.D. 437 (S.D.N.Y. 1988) (allowing plaintiff to sue insurance company anonymously to protect against identification as a homosexual); Doe v. Deschamps, 64 F.R.D. 652, 653 (D. Mont. 1974) (permitting plaintiff in abortion suit to use pseudonym due to the personal nature of pregnancy); and (3) when the anonymous party is "compelled to admit [his or her] intention to engage in illegal conduct, thereby risking criminal prosecution," Stegall, 653 F.2d at 185; see also Doe v. Commonwealth's Attorney for City of Richmond, 403 F.Supp. 1199 (E.D. Va. 1975), judgment aff'd by 425 U.S. 985 (1976).
 
 
 22
 We join our sister circuits and hold that a party may preserve his or her anonymity in judicial proceedings in special circumstances when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity. We further hold that in cases where, as here, pseudonyms are used to shield the anonymous party from retaliation, the district court should determine the need for anonymity by evaluating the following factors: (1) the severity of the threatened harm, see Southern Methodist Univ., 599 F.2d at 713; (2) the reasonableness of the anonymous party's fears, see Stegall, 653 F.3d at 186; and (3) the anonymous party's vulnerability to such retaliation, see id. (discussing vulnerability of child plaintiffs); Doe II, 655 F.2d at 922 n.1 (recognizing enhanced risks to long-term prison inmate). The court must also determine the precise prejudice at each stage of the proceedings to the opposing party, and whether proceedings may be structured so as to mitigate that prejudice. See James, 6 F.3d at 240-41 (evaluating defendants' assertions that plaintiffs' use of pseudonyms would prejudice the jury against the defendants and would impair defendant's ability to impeach plaintiffs' credibility). Finally, the court must decide whether the public's interest in the case would be best served by requiring that the litigants reveal their identities. See Stegall, 653 F.2d at 185 (recognizing that "[p]arty anonymity does not obstruct the public's view of the issues joined or the court's performance in resolving them.").
 
 
 23
 We recognize that the balance between a party's need for anonymity and the interests weighing in favor of open judicial proceedings may change as the litigation progresses. In cases where the plaintiffs have demonstrated a need for anonymity, the district court should use its powers to manage pretrial proceedings, see FED. R. CIV. P. 16(b), and to issue protective orders limiting disclosure of the party's name, see FED. R. CIV. P. 26(c), to preserve the party's anonymity to the greatest extent possible without prejudicing the opposing party's ability to litigate the case. It may never be necessary, however, to disclose the anonymous parties' identities to nonparties to the suit.
 
 IV
 
 24
 We now examine the district court's decision not to allow plaintiffs to remain anonymous at this preliminary stage of the litigation. We review a district court's case management decisions for an abuse of discretion. See Muckleshoot Tribe v. Lummi Indian Tribe, 141 F.3d 1355, 1358 (9th Cir. 1998); accord James, 6 F.3d at 238 (reviewing for an abuse of discretion a district court's decision denying plaintiffs permission to use fictitious names); Stegall, 653 F.2d at 184 (same). Thus, we may reverse the district court's decision if the district court relied on an erroneous view of the law, made a clearly erroneous assessment of the evidence, or struck an unreasonable balance of the relevant factors. See K. V. Mart Co., 173 F.3d at 1223; Creative Tech., Ltd. v. Aztech Sys. PTE, Ltd., 61 F.3d 696, 699 (9th Cir. 1995).
 
 
 25
 We conclude that the district court abused its discretion in denying plaintiffs permission to proceed anonymously at this stage of the litigation. The district court erred by failing to consider evidence of threatened retaliation by parties not before the court; concluding that risks of extraordinary economic injury are insufficient as a matter of law to satisfy plaintiffs' burden; failing to consider as a factor plaintiffs' vulnerability to retaliation; failing to identify specific prejudice to defendants; and failing to decide whether the public's interest was best served by requiring plaintiffs to reveal their identities. We also conclude, based on the extreme nature of the retaliation threatened against plaintiffs coupled with their highly vulnerable status, that plaintiffs reasonably fear severe retaliation, and that this fear outweighs the interests in favor of open judicial proceedings. No factors weigh against concealing plaintiffs' identities. At present, defendants suffer no prejudice by not knowing the identities of named plaintiffs because the district court has not ruled on plaintiffs' HoffmanLa Roche motion, and discovery is stayed. The public's interest in this case can be satisfied without revealing the plaintiffs' identities.[11]
 
 
 26
 * Severity of the Threatened Injury
 
 
 27
 The district court evaluated the severity of the threatened injury to plaintiffs, but in doing so, it improperly discounted much of plaintiffs' evidence. First, the court stated that Article III's standing requirement bars a court from redressing injuries inflicted by third parties, such as the Chinese government and recruiting agencies. Second, the court concluded that anonymity may never be used to protect against economic harm. Each of these conclusions is incorrect as a matter of law.
 
 
 28
 Article III's standing requirement does not prevent a court from allowing plaintiffs to proceed anonymously simply because plaintiffs seek to protect themselves from retaliation by third parties.[12] A district court with subject-matter jurisdiction over a case has the power to issue orders relating to third parties. See, e.g., Seattle Times v. Rhinehart, 467 U.S. 20, 37 (1984) (affirming district court's entry of a protective order limiting disclosure of the products of pretrial discovery); FED. R. CIV. P. 26 (c) (authorizing the district court to enter protective order limiting public disclosure of discovery). More to the point, this court and others have concealed parties' identities in order to protect them from retaliation by third parties and also to protect nonparties from reprisals. See Doe II, 655 F.2d at 922 n.1 (using pseudonyms in opinion to protect defendant and other nonparties from retaliation by prison inmates); Doe I, 867 F.2d at 286 n.1 (allowing asylum petitioner to use pseudonym in order to protect family in China from reprisals). Thus, the district court erred as a matter of law by refusing to take into account evidence of threatened retaliation by the Chinese government and the Chinese recruiting agencies.
 
 
 29
 The district court also erred in concluding that anonymity can never be used to shield plaintiffs from economic injury. The district court based this conclusion on the Fifth Circuit's decision in Southern Methodist University. In that case, an organization of women law students brought a class action suit against two law firms, alleging that the firms discriminated against women in hiring. Four individual lawyers sought to join the suit as anonymous plaintiffs because they feared job-related retaliation. See 599 F.2d at 710. The Fifth Circuit denied their motion, stating that they "face no greater threat of retaliation that the typical plaintiff alleging Title VII violations, including the other women who, under the real names and not anonymously, have filed sex discrimination suits against large law firms." Id. at 713 (emphasis added). Contrary to the district court's conclusion, Southern Methodist University does not stand for the proposition that evidence of economic harm is always irrelevant to the question of whether plaintiffs may proceed anonymously. Rather, the court in Southern Methodist University simply held that it was not faced with a case meriting anonymity because the threatened retaliation was not extraordinary.
 
 
 30
 Here, plaintiffs do face "greater threat[s] of retaliation than the typical [FLSA] plaintiff." While threats of termination and blacklisting are perhaps typical methods by which employers retaliate against employees who assert their legal rights, the consequences of this ordinary retaliation to plaintiffs are extraordinary. As guest workers in Saipan, plaintiffs may be deported if they lose their jobs. See 3 N. Mar. I. Code S 4434(g). Moreover, if plaintiffs are fired, blacklisted, or deported, they will be burdened with debts arising from their contracts with the recruiting agencies. Plaintiffs fear accruing debts because they know Chinese citizens who have been threatened with arrest and incarceration because they could not pay their debts to recruiters.
 
 
 31
 The district court also described plaintiffs' evidence of physical injury as "based on speculation, hearsay and innuendo." Without deciding whether the district court's ruling was correct, we wish to make clear that where, as here, plaintiffs fear extraordinary retaliation, such as deportation, arrest, and imprisonment, plaintiffs do not need to prove that they face a danger of physical injury.
 
 B
 Reasonableness of Plaintiffs' Fears
 
 32
 The district court's description of plaintiffs' evidence of threatened retaliation as "prospective and conjectural [and] based in large part on hearsay and innuendo,"[13] also suggests that plaintiffs failed to prove that their fears were reasonable. This ruling was in error because plaintiffs are not required to prove that the defendants intend to carry out the threatened retaliation. What is relevant is that plaintiffs were threatened, and that a reasonable person would believe that the threat might actually be carried out.
 
 
 33
 We believe that plaintiffs satisfied this burden. On numerous occasions, plaintiffs were interrogated about, warned against, and threatened for making complaints about their working conditions by defendants and recruiting agents. Threats ran the gamut from termination and blacklisting, to deportation, arrest, and imprisonment. Plaintiffs' employers have the power to terminate workers, and cause them to be deported. In addition, the government of China has the ability to arrest and imprison its citizens. Evidence of collaboration between defendants, the recruiting agencies, and China's government suggests that threats made by defendants and the recruiting agents may be carried out by China's government. The fact that the Chinese government has punished workers for complaining about their working conditions abroad also bolsters the reasonableness of plaintiffs' fears.
 
 
 34
 Nor do post hoc remedies for retaliation available in the district court make plaintiffs' fears unreasonable. First, the district court clearly erred in deciding that it could remedy any harm to plaintiffs for the obvious reason that the court has no ability to protect plaintiffs from reprisals when they return to China or to protect plaintiffs' family members who reside in China. Second, complaining employees are more effectively protected from retaliation by concealing their identities than by relying on the deterrent effect of post hoc remedies under FLSA's anti-retaliation provision, 29 U.S.C. S 215(a)(3).[14] See Wirtz v. Continental Finance & Loan Co. of West End, 326 F.2d 561, 563-64 (5th Cir. 1964) (stating that "the most effective protection from retaliation is the anonymity of the informer"); Mitchell v. Roma, 265 F.2d 633, 637 (3rd Cir. 1959) ("The statutory prohibition against retaliation provides little comfort to an employee faced with the possibility of subtle pressures by an employer, which pressures may be so difficult to prove when seeking to enforce the prohibition."); Gomez, 60 F.R.D. at 107 (granting FLSA plaintiffs anonymity because "[t]he method proposed by plaintiffs affords them a higher degree of security than does [S 215(a)(3)] without being subject to the vagaries that promises").
 
 C
 Plaintiffs' Vulnerability to Retaliation
 
 35
 The district court failed to consider plaintiffs' vulnerability to retaliation. Plaintiffs are nonresident foreign workers, present in Saipan for the sole purpose of working in defendants' garment factories. Under the terms of the recruitment contract, they do not have the freedom to quit working for one employer and seek employment at another factory on Saipan. Defendants may terminate plaintiffs at will and apparently also have the power to have foreign workers deported almost instantly, despite CNMI law prohibiting summary deportation. See DEP'T OF THE INTERIOR II, at 8. Also, plaintiffs reside in company housing, and evidence in the record indicates that at least some employers attempt to prevent their employees from leaving the "barracks" without permission. See DEP'T OF THE INTERIOR I, at 6.
 
 
 36
 In addition, plaintiffs' vulnerability to retaliation is enhanced at this stage of the litigation because they are twenty-three individuals among an estimated workforce of 25,000. We acknowledge that plaintiffs' vulnerability may lessen as their co-workers join the suit, providing them with safety in numbers. Cf. Engineered Building Products, Inc., 162 N.L.R.B. 649, 1967 WL 18948, at * 4 (1967) (stating that "when virtually every employee is wearing a union button the danger to each of them is greatly lessened"); The Borden Co., 157 N.L.R.B. 93, 1966 WL 18212, at * 19 (1966) (finding that employer deprived employees of "safety in numbers . . . by calling attention to the small number of union adherents").
 
 D
 Prejudice to Defendants
 
 37
 The district court correctly considered prejudice to defendants as a factor in its analysis, but failed to explain how defendants would be prejudiced. In their brief to this court, defendants argued that they face tremendous adverse publicity as a result of this lawsuit, but do not explain how knowledge of plaintiffs' identities will enable them to counter that adverse publicity. At oral argument, defendants asserted that they would be unable to mount a defense unless they knew the plaintiffs' identities. We recognize that at some later point in the proceedings it may be necessary to reveal plaintiffs' identities to defendants so that defendants may refute individualized accusations of FLSA violations. At present, however, discovery is stayed and district court has not yet ruled on plaintiffs' Hoffman-La Roche motion. Thus, at present defendants suffer no prejudice by not knowing the names of plaintiffs.
 
 E
 Public Interest
 
 38
 The district court aptly characterized this case as one with "widespread implications . . . of interest to the public at large," but concluded, without analysis, that the public interest would be served by requiring plaintiffs to reveal their identities. The district court did not explain, and we fail to see, how disguising plaintiffs' identities will obstruct public scrutiny of the important issues in this case.[15] In FLSA actions brought by the Secretary of Labor, the "informant's privilege" may be used to conceal names of employees who precipitated the suit by filing complaints with the Department of Labor. See Usery v. Ritter, 547 F.2d 528, 531 (10th Cir. 1977) (holding that "informants privilege" protects names of complaining workers from discovery); Brennan v. Engineered Products, Inc., 506 F.2d 299, 303 (8th Cir. 1974) (same); United States v. Hemphill, 369 F.2d 539, 542 (4th Cir. 1966) (same); Wirtz, 326 F.2d at 564 (same); Mitchell, 265 F.2d at 637 (same). Plaintiffs simply attempt to accomplish the same result in a suit brought under FLSA's private cause of action.
 
 
 39
 The public also has an interest in seeing this case decided on the merits. Employee suits to enforce their statutory rights benefit the general public. See Wirtz v. C & P Shoe Corp., 336 F.2d 21, 30 (5th Cir. 1964) (stating that in a FLSA suit brought by the Secretary of Labor, "the Government becomes an active protagonist for the double purpose of protecting private interests and vindicating public rights"); Plourde v. Massachusetts Cities Realty Co., 47 F.Supp. 668, 670 (D. Mass. 1942) ("An employee, exercising his rights under[FLSA], exercises them, not only for his own benefit, but also for the benefit of the general public."); see also Alexander v. Gardner-Denver Co., 415 U.S. 36, 44 (1974) (stating that a private Title VII plaintiff "not only redresses his own injury but also vindicated the important congressional policy against discriminatory employment practices"). Moreover, as the Supreme Court has recognized, fear of employer reprisals will frequently chill employees' willingness to challenge employers' violations of their rights. See Mitchell v. Robert De Mario Jewelry, Inc., 361 U.S. 288, 292 (1960) ("[I]t needs no argument to show that fear of economic retaliation might often operate to induce aggrieved employees quietly to accept substandard conditions."); see also NLRB v. Robbins Tire & Rubber Co., 437 U.S. 214, 240 (1978) ("The danger of witness intimidation is particularly acute with respect to current employees . . . over whom the employer, by virtue of the employment relationship, may exercise intense leverage."). Thus, permitting plaintiffs to use pseudonyms will serve the public's interest in this lawsuit by enabling it to go forward.
 
 V
 
 40
 We reverse the district court order granting defendants' motion to dismiss and denying plaintiffs' cross motion to proceed anonymously. Defendants may renew their motion to dismiss after the district court rules on plaintiffs' Hoffman-La Roche motion and the deadline for additional plaintiffs to join the suit expires.
 
 
 41
 REVERSED.
 
 
 
 Notes:
 
 
 [1]
 The Honorable Myron Bright, Circuit Judge for the Eight Circuit Court of Appeals, sitting by designation.
 
 
 [2]
 See Hoffman-La Roche v. Sperling , 493 U.S. 165, 169 (1989).
 
 
 [3]
 See UNITED STATES DEP'T OF THE INTERIOR, FEDERAL-CNM I INITIATIVE ON LABOR, IMMIGRATION, AND LAWENFORCEMENT IN THE CNMI 17 (4th Annual Report 1998) ("DEP'T OF THE INTERIOR I"); UNITED STATES DEP 'T OF THE INTERIOR, FEDERAL-CNMI INITIATIVE ON LABOR, IMMIGRATION, AND LAW ENFORCEMENT IN THE CNMI 8 (3d Annual Report 1997) ("DEP'T OF THE INTERIOR II"); Congressman George Miller and Democratic Staff of the House Committee on Resources, Beneath the American Flag: Labor & Human Rights Abuses in the CNMI 10-11 (Mar. 26, 1998).
 
 
 [4]
 The defendants are Advanced Textile Corporation; American Investment Corporation; American Pacific Textile, Inc., a corporation; Concorde Garment Manufacturers Corporation; Diorva (Saipan), Ltd.; Global Manufacturing, Inc.; Grace International, Inc.; Hansae (Saipan), Inc.; Joo Ang Apparel, Inc.; L&T International Corporation, Inc.; Mariana Fashions, Inc.; Marianas Garment Manufacturing, Inc.; Michigan, Inc.; Micronesian Garment Manufacturing, Inc.; Neo Fashion, Inc.; N.E.T. Corporation; Pan Jin Sang Sa Corporation; Sako Corporation; Top Fashion Corporation; Trans Asia Garment Forte Corporation; United International Corporation; and US CNMI Development Corporation.
 
 
 [5]
 After the complaint was filed in this case, additional garment workers joined the suit but also concealed their identities by filing consents to sue under seal. At oral argument, counsel for plaintiff informed the court that the number of consents to sue filed with the district court had reached 320.
 
 
 [6]
 Initially, the district court stayed its July 19, 1999 order for forty-five days. It subsequently extended the stay, first until September 8, 1999, and then until November 24, 1999. On September 8, 1999, the district court denied plaintiffs' motion to continue filing consents to sue under seal pending appeal. On November 10, 1999, we granted plaintiffs' motion to stay the district court's July 19, 1999 order and to allow them to continue filing consents to sue under seal while the appeal is pending.
 
 
 [7]
 Much of this evidence is contained in declarations by garment workers that were filed under seal and only made available to defendants' counsel. As a result, we do not recount the specific details of the declarations.
 
 
 [8]
 Section 1291 provides that "[t]he courts of appeals . . . shall have jurisdiction of appeals from all final decisions of . . . the District Court of Guam." Under the Covenant to Establish a Commonwealth of the Northern Mariana Islands, codified at 48 U.S.C. S 1801, "[t]hose portions of Title 28 of the United States Code which apply to . . . the District Court of Guam will be applicable to . . . the District Court of the Northern Mariana Islands." Art. IV S 403(b).
 
 
 [9]
 The Supreme Court has implicitly endorsed the use of pseudonyms to protect plaintiffs' privacy. See Roe v. Wade, 410 U.S. 113 (1973) (abortion); Doe v. Bolton, 410 U.S. 179 (1973) (abortion); Poe v. Ullman, 367 U.S. 497 (1961) (birth control).
 
 
 [10]
 In our published opinion in Doe II, we substituted pseudonyms for the real names of the defendant and three other individuals. See 655 F.2d at 922 n.1. As a result, we did not decide when a party may conceal his identity during district court proceedings.
 
 
 [11]
 We are perplexed by the district court's statement that "any protection afforded by anonymous proceedings would . . . be nugatory" because "the names of many plaintiffs, as attested to in their declarations, are already known to defendants through various sources including the filing of Department of Labor and Immigration ["DOLI "] complaints." First, our review of the record reveals that defendants may have identified, at most, ten plaintiffs. Thus, continued concealment of identities will provide protection to the remaining thirteen plaintiffs. Second, the fact that some employees chose to file DOLI complaints under their true names does not refute plaintiffs' evidence that they hold a reasonable fear of retaliation. Past acts of bravery in the face of danger is poor rationale for denying the courageous individual protection against future harm. Finally, whatever knowledge defendants have of plaintiffs' identities only lessens their claims to be prejudiced by the use of pseudonyms.
 Defendant N.E.T. focuses on the fact that Jane Doe XIX, the only named plaintiff who it employs, did not submit a declaration attesting to threats of retaliation. Thus, N.E.T. argues that there is no basis for allowing Jane Doe XIX to conceal her identity. N.E.T. neither joined the motion to dismiss nor opposed plaintiffs' cross-motion to proceed anonymously, and as a result, N.E.T. may not raise its argument for the first time on appeal. See Broad v. Sealaska Corp., 85 F.3d 422, 430 (9th Cir. 1996) (stating that as a general rule this court will not consider arguments raised for the first time on appeal). In any event, N.E.T.'s argument lacks merit. Plaintiffs need not prove that each and every garment worker who joins the suit faces an individualized risk of retaliation. Rather, the evidence in the record demonstrates that all nonresident garment workers reasonably fear sufficiently severe retaliation by the recruiting agencies, the Chinese government, and their employers to warrant their anonymity.
 
 
 [12]
 The standing aspect of jurisdiction exists to ensure that a court has the power to redress the alleged injury. The injuries alleged by plaintiffs, and on which the district court's jurisdiction is premised, are defendants' FLSA violations, not the threatened harm by third parties if plaintiffs' identities are revealed. Thus, plaintiffs have standing to sue because the district court can redress the FLSA violation by ordering defendants to pay damages. See Gladstone Realtors v. Village of Bellwood, 441 U.S. 91, 100 (1979) (holding that a plaintiff has standing if she has personally suffered some actual or threatened injury as a result of the defendant's conduct).
 
 
 [13]
 The district court made only this general statement about the plaintiffs' evidence but, presumably because the declarations were filed under seal, did not discuss any evidence specifically.
 
 
 [14]
 At oral argument, the Secretary of Labor, participating as amicus, stated that the Secretary's position is that S 215(a)(3) is not effective in protecting employees from retaliation.
 
 
 [15]
 For instance, the question whether there is a constitutional right to abortion is of immense public interest, but the public did not suffer by not knowing the plaintiff's true name in Roe v. Wade.