**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

IN RE: THOMAS E. PEREZ,

No. 13-72195

THOMAS E. PEREZ, Secretary, United
Sates Department of Labor,
                    *Petitioner*,

D.C. No.
3:08-cv-05479-
BHS

v.

UNITED STATES DISTRICT COURT,
TACOMA,
                    *Respondent*,

OPINION

STATE OF WASHINGTON
DEPARTMENT OF SOCIAL AND
HEALTH SERVICES,
                    *Real Party in Interest.*

Petition for Writ of Mandamus to the
United States District Court
for the Western District of Washington
Benjamin H. Settle, District Judge, Presiding

Argued and Submitted
March 4, 2014—Portland, Oregon

Filed April 18, 2014

Before: Alfred T. Goodwin, Stephen S. Trott, and
William A. Fletcher, Circuit Judges.

Opinion by Judge Trott

## SUMMARY*

### Mandamus

The panel granted the Secretary of the United States Department of Labor's petition for a writ of mandamus, and vacated the district court's order compelling the Secretary's response to interrogatories, in the Secretary's action against the Washington State Department of Social and Health Services alleging violations of the Fair Labor Standards Act.

The Secretary of Labor's proof of the alleged Fair Labor Standards Act violations came from 400 employee statements—350 of which the Secretary obtained after he had filed suit. The district court held that the 350 employees were not informants whose identities were protected from discovery by the government's informants privilege, and ordered the Secretary to answer three interrogatories that would disclose their identities.

The panel granted the Secretary's petition for a writ of mandamus to avoid disclosing the employees' identities because the timing of the employees' statements did not affect their status as informants, and because knowledge of

---

* This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

the informants' identities would not significantly aid the Washington State Department of Social and Health Services. The panel directed the district court to enter a protective order consistent with its opinion.

## COUNSEL

Rachel Goldberg (argued), Senior Attorney, M. Patricia Smith, Solicitor of Labor, Jennifer S. Brand, Associate Solicitor, Paul L. Frieden, Counsel for Appellate Litigation, United States Department of Labor, Washington, D.C., for Petitioner.

Kara A. Larsen (argued), Senior Counsel, Labor and Personnel Division, Robert W. Ferguson, Attorney General, Washington State Office of the Attorney General, Olympia, Washington, for Real Party in Interest.

## OPINION

TROTT, Circuit Judge:

Thomas Perez, the Secretary of the United States Department of Labor, sued the Washington State Department of Social and Health Services ("DSHS"), alleging violations of the Fair Labor Standards Act's overtime and record-keeping provisions. The Secretary's proof of the alleged violations comes from 400 employees' statements – 350 of which he obtained after he had filed suit. Over the Secretary's objection, the district court held that these 350 employees are not informants whose identities are protected from discovery by the government's informants privilege.

For this reason, and because it believed DSHS's defense depended upon knowing the identities of the informants, the district court ordered the Secretary to answer three interrogatories that would disclose their identities. To avoid that result, the Secretary petitioned this court for a writ of mandamus. Because we are convinced that the timing of the employees' statements does not affect their status as informants, and because knowledge of the informants' identities will not significantly aid DSHS, we grant the petition.

# I

In 2006, the Wage and Hour Division of the Department of Labor received a complaint from Karen Patton. Patton claimed that, while employed as a social worker in DSHS's Walla Walla office, she was not paid overtime despite working on average 45–65 hours per week. An initial investigation followed, during which approximately 50 additional social workers made similar claims. These social workers were told by their supervisors that it was DSHS's policy not to authorize overtime, except in emergencies, and to "flex" their schedules to make up for the hours of overtime worked. However, the demands of the social workers' caseloads prevented them from taking "flex" time.

This initial investigation convinced the Secretary that, between 2006 and 2008, case-carrying, levels-II and -III social workers regularly worked over 40 hours per week, did not record all the hours they worked, and were not compensated for the majority of overtime they worked. The Secretary filed suit on behalf of these "affected employees," alleging that DSHS violated the Fair Labor Standards Act's

("FLSA" or "Act") overtime and record-keeping provisions. 29 U.S.C. § 207 (overtime); *Id.* § 211(c) (record keeping).

Early in the litigation, DSHS compiled and provided the Secretary with a list of all affected employees, ultimately totaling just under 2,000 social workers. The affected employees worked (and most still do) at DSHS's 42 offices spread throughout seven regions of Washington. The affected employees are all part of DSHS's Children's Administration, which is divided into three primary program areas. Social workers with Child Protective Services take and investigate claims of child abuse and, when necessary, work to place children in safe, alternative housing. Social workers with Child and Family Welfare Services "provide permanency planning and intensive treatment services for families who need help protecting or parenting children." These social workers primarily work with children who are dependents of the state and live outside of their family homes. Social workers with Family Reconciliation Services provide "voluntary in-home services focused on developing skills and support within families" for at-risk youths or on resolving family conflicts.

With DSHS's list in hand, the Secretary continued his investigation into the alleged violations by mailing to 1,500[1] of the affected employees a questionnaire asking the employees about their work conditions. The Secretary told the recipients that, if they responded, he would keep their names and identifying information confidential, unless they

---

[1] Five hundred employees were not mailed a questionnaire because their names were added to the list of affected employees after the questionnaire was sent.

authorized its release or if a court ordered its disclosure. The Secretary received approximately 350 responses.

During the course of discovery, DSHS served the Secretary with the three interrogatories that prompted this petition.

> Interrogatory No. 1: Please identify each and every person who has knowledge of the facts alleged in your Complaint or any other facts that support or refute the allegations in the Complaint and, for each such person, specify the precise facts of which they have [sic] knowledge, including but not limited to, (with respect to DSHS Employees) hours scheduled, worked, reported, or paid; days scheduled, worked, reported, or paid; overtime scheduled, worked, reported, or paid; and why hours, days, or overtime were or were not reported.

> Interrogatory No. 4: For each and every DSHS Employee listed in Exhibit A to the Complaint and for each week from February 2006 to the present, please state the hours per day and per week that you allege that he or she worked.

> Interrogatory No. 6: For each DSHS employee, for whom you seek overtime payment, please state the weeks for which you seek such overtime payment, the number of hours worked during each of those weeks, and the amount allegedly due for each week.

The Secretary objected to answering these interrogatories on the ground that turning over the 50 statements taken during the initial interview and the 350 returned questionnaires "requested by [DSHS] would reveal the identities of individuals who cooperated with [the Secretary's] investigation and litigation." Acting through the Deputy Administrator of the Wage and Hour Division, the Secretary "invoke[d] the Government's informant privilege to protect from disclosure the identities, and any portions of other documents which could reveal the identities, of persons who have provided information to the United States Department of Labor in the instant case."

However, the Secretary waived the privilege as to 150 affected employees who had authorized the disclosure of their identities and provided DSHS with complete copies of their statements. With respect to the 250 employees who wished to remain anonymous, the Secretary disclosed their statements, but he redacted any information that identified or tended to identify the employee. This included the employee's name; the employee's contact information; the employee's position, if it appeared to the Secretary that the employee held a unique position; the office location where the employee worked; and the employee's period of employment. These redacted statements still contained, where available, the hours, days, and overtime worked, scheduled, and paid.

Unsatisfied, DSHS filed a motion to compel the Secretary to provide the requested information, and the Secretary filed for a protective order. The motions debated primarily (1) whether the Secretary properly asserted the privilege and, assuming he did, (2) whether the privilege applied in this case. On the latter point, DSHS argued that its interrogatories

did not seek the identities of the informers because the interrogatories pertained to all affected employees. Moreover, even if the identities of informers were revealed, DSHS argued it needed the information to show disparities between affected employees across the state.

In response, the Secretary explained that the information DSHS sought only exists for those 400 employees who provided statements during the investigation. These employees, continued the Secretary, are "categorically informants because of this communication." He had already turned over the unredacted statements of the 150 affected employees and the remaining redacted statements. Therefore, the Secretary could only respond with information that would reveal the identities of the 250 anonymous employees.

The district court ultimately agreed with DSHS. The court concluded that the Secretary had properly invoked the privilege, but it held that answering the three interrogatories would not disclose the informants' identities. The court reasoned that "the release of general information as to all employees who were not paid overtime does not tend to identify specific informants."

The Secretary then asked the district court to reconsider its ruling. In support of his motion, the Secretary reiterated that he could not provide the requested information for all 2,000 affected employees because the only information in his possession came from the 400 employee statements. The Secretary further explained that he intended to proceed to trial under the burden-shifting scheme established by *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946).

Understanding the effect of *Mt. Clemens Pottery* is key to understanding the Secretary's burden and case. In cases where an employer has not kept accurate records of employees' time, *Mt. Clemens Pottery* allows the Secretary to prove an FLSA violation by showing that employees performed work for which they were improperly compensated and producing some evidence to show the amount and extent of that work "as a matter of just and reasonable inference." *Id.* at 687. We have held that the Secretary's evidence may consist of "fairly representative testimony" from a sample of employees. *McLaughlin v. Ho Fat Seto*, 850 F.2d 586, 589 (9th Cir. 1988). If the Secretary carries his burden, "[t]he burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the [Secretary's] evidence." *Mt. Clemens Pottery*, 328 U.S. at 687–88. If the Secretary is not able to carry his burden, his case may not proceed.

The Secretary's sample in this case would come from only those 150 employees who had authorized the disclosure of their identities. Through these employees' testimony, the Secretary would establish at trial that, "regardless of whether [an affected employee] is in Bremerton or Bellingham or Richland or Spokane," his or her duties and hours worked are a fair approximate for any other social worker employed by DSHS.

DSHS responded with two arguments. First, it argued that only the 50 employees who gave their statements during the initial investigation were protected by the informants privilege, not those 350 employees who gave their statements after the Secretary had filed suit. Second, assuming the privilege attached to all 400 employees, DSHS argued that its

need for the information outweighed the Secretary's interest in keeping the information a secret. In DSHS's opinion, a social worker working for Child Protective Services in rural Richland, for example, is not representative of a social worker working for Child Protective Services in urban Seattle because the two have clients with different needs, encounter different obstacles associated with their disparate geographies, and rely on different supervisors to authorize overtime. DSHS wished to compare the complete statements against its records to establish these differences.

Again the district court agreed with DSHS's arguments. Relying on language from *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1072 (9th Cir. 2000), the district court held that the privilege protects only "employees who precipitated the suit by filing complaints." The court also concluded that it was "essential" that DSHS receive answers to its interrogatories so it could rebut the Secretary's evidence.

This petition followed.

## II

Before turning to the heart of this matter, we pause to address DSHS's argument that the Secretary invoked the informants privilege only in response to DSHS's requests for documents, not its interrogatories. Not so. The Secretary's assertion of the privilege made clear that he was concerned with protecting the informants' identities, regardless of the form of the disclosure.

**III**

This court has jurisdiction to issue a writ of mandamus under the All Writs Act, 28 U.S.C. § 1651. Mandamus is a "drastic and extraordinary remedy" reserved for "only exceptional circumstances." *Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 380 (2004) (internal quotation marks and citation omitted). Generally, this standard makes the writ unavailable in the discovery context for two important reasons. First, this court is particularly reluctant to interfere with a district court's day-to-day management of its cases. *See, e.g.*, *In re Anonymous Online Speakers*, 661 F.3d 1168, 1173 (9th Cir. 2011). Second, "the petitioner must satisfy the burden of showing that his right to issuance of the writ is clear and indisputable." *Cheney*, 542 U.S. at 381 (internal quotation marks, brackets, and citations omitted). Because the district court has discretion to control discovery, it is hardly ever the case that a petitioner's "right to a particular result is 'clear and indisputable.'" *See Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980) (per curiam). Nevertheless, we have exercised our mandamus jurisdiction "to define the scope of an important privilege." *Perry v. Schwarzenegger*, 591 F.3d 1147, 1157 (9th Cir. 2010); *see also Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 111 (2009) (noting that when the disclosure of privileged information works a "manifest injustice," mandamus may lie). Ultimately, whether to issue the writ is within this court's discretion. *In re Van Dusen*, 654 F.3d 838, 841 (9th Cir. 2011).

Five factors guide our judgment:

(1) whether the petitioner has other adequate means, such as a direct appeal, to attain the relief he or she desires;

(2) whether the petitioner will be damaged or prejudiced in a way not correctable on appeal;

(3) whether the district court's order is clearly erroneous as a matter of law;

(4) whether the district court's order makes an "oft-repeated error," or "manifests a persistent disregard of the federal rules"; and

(5) whether the district court's order raises new and important problems, or legal issues of first impression.

*Id.* (quoting *Bauman v. U.S. Dist. Court*, 557 F.2d 650, 654–55 (9th Cir. 1977)). "Not every factor need be present at once; indeed, the fourth and fifth will rarely be present at the same time." *Burlington N. & Santa Fe Ry. Co. v. U.S. Dist. Court for the Dist. of Mont.*, 408 F.3d 1142, 1146 (9th Cir. 2005). However, the third factor – clear error – is a necessary prerequisite for the writ to issue. *Id.* The clear error standard requires of us a "firm conviction" that the district court misinterpreted the law, *In re Cement Antitrust Litig.*, 688 F.2d 1297, 1306–07 (9th Cir. 1982), or committed a "clear abuse of discretion," *Cheney*, 542 U.S. at 380 (internal quotation marks omitted).

**A**

DSHS argues that the first mandamus factor is not met because the Secretary could very well decide to violate the district court's order to compel. The sanction for such a violation, DSHS continues, is normally dismissing the case, in which event an appeal would certainly follow. Our case law does not require a party like the Secretary to take such a drastic step in lieu of filing a petition for mandamus. *See, e.g.*, *Perry*, 591 F.3d at 1157 (concluding that the first factor was satisfied because "[a] discovery order . . . is interlocutory and non-appealable under 28 U.S.C. §§ 1291, 1292(a)(1) and 1292(b)") (internal quotation marks omitted); *Hernandez v. Tanninen*, 604 F.3d 1095, 1101 (9th Cir. 2010) (same).

The second factor is met in this case. Once the identities of the 250 anonymous employees are disclosed, they cannot be protected again by a successful appeal or otherwise.

As we explain below, the limitation the district court placed on when the informants privilege attaches is novel, unjustified, and clearly erroneous as a matter of law. Combined with the district court's incorrect balancing of interests, we conclude that the third and fifth *Bauman* factors are satisfied. As is often true when the fifth factor is met, the fourth is absent.

**B**

Apparently to rein in what it described as a "broad application of the privilege," the district court held that 350 of the 400 affected employees who gave statements about their work conditions did not qualify as informants entitled to the protection of the privilege. The distinction the district

court believed justified treating the 350 employees differently from the other 50 was the timing of their respective disclosures. The former group of employees spoke after the Secretary filed suit, whereas the latter group spoke before that point. The court's differentiation between the two groups was clear legal error.

In *Roviaro v. United States*, 353 U.S. 53 (1957), the Supreme Court set out the modern formulation of the informants privilege. In order to promote effective law enforcement, the privilege protects "the identity of persons who furnish information of violations of law to officers charged with enforcement of that law" from "those who would have cause to resent the communication." *Id.* at 59–60. However, the privilege will give way "[w]here the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause." *Id.* at 60–61. The dividing line the district court drew promotes neither effective law enforcement nor fair trials.

Informants are an important lot because the FLSA, and the "great public policy which it embodies," *Mt. Clemens Pottery*, 328 U.S. at 687, relies for its enforcement "upon 'information and complaints received from employees seeking to vindicate rights claimed to have been denied.'" *Kasten v. Saint-Gobain Performance Plastics Corp.*, 131 S. Ct. 1325, 1333 (2011) (quoting *Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 292 (1960)). The Secretary's dependance on these crucial employees continues even after the complaint is filed, as this case demonstrates. The 350 affected employees that the district court held were not covered by the privilege provided the Secretary with information that allowed him to assess the scope of the

DSHS's alleged violations and to identify those 150 informants who will serve as the Secretary's representative sample. The Secretary was able to contact these employees only after the start of discovery when DSHS provided him with the list that identified all of the affected employees by name. This dynamic follows the typical progression of a civil suit. Most often, it is after the commencement of litigation that "parties . . . obtain the fullest possible knowledge of the issues and facts" of their case. *See Hickman v. Taylor*, 329 U.S. 495, 501 (1947).

DSHS argues that the privilege is an unnecessary investigative tool once litigation has commenced because employees "can be required to come forward and testify via the subpoena process." We reject this argument because it would "take needed flexibility from those charged with the Act's enforcement." *Saint-Gobain*, 131 S.Ct. at 1334. One need not be a seasoned litigator to understand that a witness whose assistance is compelled is going to be less helpful than a witness whose assistance is voluntarily given. By being able to offer an employee the protection the informants privilege affords, the Secretary has a better chance at a candid dialog.

Furthermore, the timing of the employee's disclosure is unlikely to temper the reaction of an employer who feels he has been betrayed by his employee. The informants privilege is a particularly effective means of preventing retaliation. *See Does I thru XXIII*, 214 F.3d at 1071 ("[C]omplaining employees are more effectively protected from retaliation by concealing their identities than by relying on the deterrent effect of *post hoc* remedies under the FLSA's anti-retaliation provision . . . ."); *United States v. Hemphill*, 369 F.2d 539, 542 (4th Cir. 1966) (describing the FLSA's anti-retaliation

provision as an insufficient sanction because "retribution can be subtle and cunning and difficult to prove"); *Wirtz v. Cont'l Fin. & Loan Co. of W. End*, 326 F.2d 561, 563–64 (5th Cir. 1964) ("[T]he most effective protection from retaliation is the anonymity of the informer. The pressures which an employer may bring to bear on an employee are difficult to detect and even harder to correct.").

DSHS's promise not to retaliate is similarly insufficient to dispel such fears. A common theme in the employees' statements is that they were told by their immediate supervisors not to request overtime because the funding was not available. Several employees further reported being reprimanded or threatened with discipline when they persisted in requesting or recording overtime. As a practical matter, we are not convinced that DSHS can effectively monitor all 42 supervisors' daily conduct to enforce its promise. Here too an ounce of prevention is worth a pound of cure. Nor is it feasible for an employee to engage in self-help, if the only way for an employee to enforce DSHS's promise would be for the employee to engage in litigation. The privilege properly invoked relieves the employees from the prospect of that burden.

Denying outright the informants privilege to employees who aid in the enforcement of the Act after commencement of litigation summarily denies protection to a group of informants after an arbitrary deadline and thereby dispenses with the balancing of interests that *Roviaro* requires. 353 U.S. at 62. This is exactly the type of bright-line rule that the Court has rebuffed. *McCray v. Illinois*, 386 U.S. 300, 311 (1967) ("What *Roviaro* thus makes clear is that this Court was unwilling to impose any absolute rule requiring disclosure of an informer's identity . . . ."). Therefore, we

hold that the 350 affected employees who provided the Secretary with relevant information after the complaint had been filed in this case are informants who are eligible for the privilege's protection.

## C

The district court based its holding on this court's opinion in *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058 (9th Cir. 2000). *Does* concerned 23 garment workers on the island of Saipan who sued their employers for violating the FLSA. *Id.* at 1063. In their complaint, the plaintiffs used pseudonyms instead of their real names for fear that they and their family members would suffer reprisals at the employers' hands because of the suit. *Id.* The district court ordered the disclosure of their identities, holding that the defendants' need to investigate and defend the case plus the public's interest in transparent proceedings outweighed the plaintiffs' desire for anonymity. *Id.* at 1064. We reversed.

We rejected the idea that "disguising [the] plaintiffs' identities w[ould] obstruct public scrutiny of the important issues in th[e] case," in part, because they simply sought the same protection afforded "[i]n FLSA actions brought by the Secretary of Labor, [where] the 'informant's privilege' may be used to conceal names of employees who precipitated the suit by filing complaints with the Department of Labor." *Id.* at 1072. Read in context, we chose the words "employees who precipitated the suit" because those informants were also the plaintiffs before us. The passage does not suggest, much less hold, that the informants privilege applies only to that narrow category of employees who provide information before litigation begins. *Does* does not help DSHS.

The same is true of the cases DSHS cites to support the district court's reading of *Does*. While some of those cases spoke about employees whose complaints initiated the suit, *e.g.*, *Hemphill*, 369 F.2d at 542 (accepting the risk that some "early informants" might be identified as such when the Secretary listed his witness); *Cont'l Fin. & Loan Co. of W. End*, 326 F.2d at 562 (addressing interrogatories aimed at "all persons who had filed complaints charging violations of the [FLSA]"), none of them grappled with the timing issue presented by this petition. As a result, we do not find the support that DSHS ascribes to them.

*Roviaro* already provides the limiting principle the district court was searching for: "Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." 353 U.S. at 60–61. It is to the district court's balancing of interests under this standard that we now turn our attention.

## IV

For the informants privilege to give way, the party seeking disclosure has the burden of showing that its need for the information outweighs the government's interest in nondisclosure. *See United States v. Prueitt*, 540 F.2d 995, 1003–04 (9th Cir. 1976). The proper balancing of these competing interests lies within the discretion of the district court, after taking into consideration "the particular circumstances of each case." *Roviaro*, 353 U.S. at 62.

Here, DSHS argued before the district court that its interrogatories sought information about *all* 2,000 affected

employees' different positions, sub-agencies, regions, offices, supervisors, and job duties. With this information, DSHS argued it could then "demonstrate substantial differences among individuals and groups [of employees] based on all of these variables," and the identities of the informers would remain hidden in plain sight. The district court accepted this contention and concluded that (1) it was "essential" for DSHS to receive answers to its interrogatories and (2) providing those answers would not significantly jeopardize the Secretary's interests. The problem is that both of these conclusions start from a flawed perception of the universe of responsive information in the Secretary's possession.

The Secretary does not have information as to all 2,000 affected employees. The only information in the Secretary's possession comes from the 400 statements he received during the initial investigation and in response to the questionnaire. This fact dramatically affects how the scales tip in this case.

Whether the Secretary can successfully prove his allegations at trial under *Mt. Clemens Pottery* will depend almost entirely on the 150 employees who make up his representative sample. It is with their testimony that the Secretary will be required to show "as a matter of just and reasonable inference" that all 2,000 affected employees' work conditions are substantially similar so as to merit class-wide relief. *Ho Fat Seto*, 850 F.2d at 589 (quoting *Mt. Clemens Pottery*, 328 U.S. at 687). DSHS knows all the details it seeks with respect to these key employees because the Secretary has turned over their 150 statements *in total*.

Moreover, DSHS already had and has in its possession the information it needs to compare these 150 employees against the remaining 1,850 affected employees. How else could

DSHS have compiled the list of 2,000 case-carrying, levels-II and -III social workers who worked in its 42 offices since 2006 if it did not know these employees' dates of employment, locations, and job duties? *See Mt. Clemens Pottery*, 328 U.S. at 687 ("Due regard must be given to the fact that it is the employer . . . who is in position to know and to produce the most probative facts concerning the nature and amount of work performed."); *Wirtz v. B.A.C. Steel Prods., Inc.*, 312 F.2d 14, 16 (4th Cir. 1963) ("Indeed, most of the information needed to prosecute or defend the case was in the defendants' possession from the beginning; this was the defendants' book and records.").

What of the remaining 250 statements provided by employees who have not consented to having their identities revealed? Much of the content of these 250 employees' statements has been turned over, including information about the hours the employees worked, even though they will not be called as witnesses. The information that the Secretary has not disclosed consists of *only* the identifying information in the 250 statements. While this withheld information may meet the general standard for relevance under the Federal Rule of Evidence 401, we are not convinced that its probative value is so great that it is "essential" to DSHS's defense. DSHS cannot force the Secretary to reveal the identities of his informants on such a weak showing. *See United States v. Valenzuela-Bernal*, 458 U.S. 858, 870 (1982) ("The *Roviaro* Court held that the informer's identity had to be disclosed, but only after it concluded that the informer's testimony would be *highly* relevant[.]") (emphasis added); *Dole v. Local 1942, Int'l Bhd. of Elec. Workers, AFL-CIO*, 870 F.2d 368, 375 (7th Cir. 1989) ("The informer's privilege will yield upon a showing of substantial need."); *B.A.C. Steel*, 312 F.2d at 16 ("Although the privilege is not absolute, the defendants have

shown no special circumstance which would justify withdrawing the qualified privilege . . . ."); *Hodgson v. Charles Martin Inspectors of Petroleum, Inc.*, 459 F.2d 303, 307 (5th Cir. 1972) ("[D]efendant must . . . make a sufficient showing to overcome the Secretary's claim of privilege . . . . This the defendant has not done.").

## V

In sum, (1) the district court erroneously limited the scope of the informants privilege by focusing on the timing of the informants' statements, and (2) DSHS does not have a compelling need for the identities or identifying information of the 250 employees who will not be witnesses at trial. Accordingly, we grant the petition for a writ of mandamus. We hereby vacate the district court's order to compel the Secretary's response to DSHS's interrogatories, and we direct the district court to enter a protective order consistent with this opinion.

**PETITION GRANTED.**